THE STATE vs. BENJAMIN F. GLIDDEN AND OTHERS.

New Haven Co., Dec. T., 1886. PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

If two or more persons combine to commit a crime or misdemeanor, such combination is itself a crime.

And where the end sought is in itself lawful, a combination to use criminal means to accomplish it is a crime.

The act of 1878 (Session Laws of 1878, ch. 92), provides that "every per-

State *v.* Glidden.

son who shall threaten or use any means to intimidate any person, to compel him to do or abstain from doing any act which he has a legal right to do, or shall injure or threaten to injure his property with the intent so to intimidate him, shall be liable," etc. The defendants conspired to intimidate the publishers of a certain newspaper called the Journal & Courier, to compel them to discharge against their will certain of their workmen and to employ the defendants and such persons as they should name. Held to fall within the prohibition of the statute.

The defendants' purpose was to deprive the publishing company of its liberty to carry on its business in its own way, although in doing so it interfered with no right of the defendants. The motive was to gain an advantage unjustly and at the expense of others, and therefore the act was legally corrupt. As a means of accomplishing the purpose the parties intended to harm the publishing company, and therefore it was malicious.

It was also a crime for the defendants to seek to injure other workmen of the publishing company by depriving them of their employment. These workmen had just as good a right to work for the publishing company as the defendants had, and their right is entitled to the same consideration and protection.

The defendants attempted not merely to injure the publishing company, but all persons who should patronize that company by subscribing for their paper or advertising in it. Held that such conduct must be regarded as *primâ facie* malicious and corrupt.

The origin and meaning of the term "boycott" considered.

One *K*, who was one of the conspirators, referring to a controversy they had just had with another newspaper, had said that if they had another battle the publishing company would have to pay the expenses of the boycott. This declaration was made to one of the workmen in the company's office. Shortly before this *K* and one of the defendants had had an interview with this workman in which they endeavored to induce him to take part with them against the publishing company. Held that *K's* declarations might be regarded as supplementary to the efforts last mentioned and so as acts in the prosecution of the conspiracy, and that as such they were admissible against the defendant.

To prove that one of the defendants distributed a certain circular, a witness was introduced who testified that this defendant and another person not known was seen by him in the evening walking up and down in the street in company, and that from between them copies of the circular were from time to time dropped on the sidewalk. The circular was as follows in large letters : "A word to the wise is sufficient. Boycott the Journal & Courier." Held that this was proper evidence to go to the jury and that they might properly find upon it that the defendant in question distributed the circulars.

The same defendants with others had previously been active in boycotting a paper called "The News." In carrying out their conspiracy against the publishing company frequent reference was made to what had been done against "The News,"—such references being intended and un-

derstood as a threat against the publishing company. Held that to enable the jury to understand the full force of the threat, evidence was admissible as to what had been done against the "News."

A witness who had testified for the state as to a certain interview which he had had with the publishers of the "News" as to the payment by them of $500, was asked on cross-examination what one of the defendants had said to him at a subsequent time with regard to the same matter, the state in the direct examination not having referred to it. Held to be inadmissible.

A witness was offered by the state for the purpose of proving that he printed certain circulars used by the defendants. On the stand the witness refused to testify on the ground that his testimony would tend to criminate him. The judge of another court was then called on to testify what the witness had sworn to with regard to the matter on the trial of another case before him. The evidence was objected to on the ground that as the witness was not a defendant his declarations as a co-conspirator could not be proved. Held that as the testimony was not offered for that purpose, but for the purpose of proving the fact that the witness printed the circulars, and as the evidence was not objected to as inadmissible for that purpose, the error, if any, in admitting the evidence was not a ground for granting a new trial.

A witness offered by the state testified that she heard a conversation among five or six printers, members of the typographical union, among whom was one of the defendants and the others not identified, in which it was stated, but by whom she could not say, that they were paying fifty cents a week for the expenses of the Courier boycott, and that it would be paid for by the Courier. Held that it was not going too far to assume that they were parties to the conspiracy, and that their declarations were therefore admissible not only against the defendant who was present but against the other defendants also.

[Argued January 28th—decided February 18th, 1887.]

INFORMATION for a conspiracy, in the Superior Court in New Haven County. The defendants were Benjamin F. Glidden, David McNamara, Thomas Mulcahy and Frederick Busche. The information contained six counts.

The first count charged the object of the conspiracy to have been (1) to compel the Carrington Publishing Company, a corporation and the publishers of a newspaper, against its will to discharge its workmen, and to employ such persons as the defendants and their associates should name; and (2) to injure and oppress the workmen then in the employ of the corporation, by depriving them of their employment; that the means to be employed to accomplish these purposes were to demand the discharge of the work-

men and the employment of the defendants; and if such demand was not complied with within forty-eight hours, the defendants and their associates were to represent to and threaten the corporation, that there were associated in combination with the defendants' the members in the city of divers secret and large labor unions to the number of one thousand persons, who could, by the fear and terror to be created by the secrecy and discipline of their organizations, and by the large number of the members thereof, and by the to be threatened and concerted withdrawal of the patronage of the defendants and their associates, and by stopping and preventing the patronage of others through threats and intimidations, and by other unlawful means, so control the persons dealing with the corporation as to compel them, though against their will, to cease doing busines with the corporation; and who could and would boycott the business of the corporation, and so would substantially injure and destroy its business and prevent the same from being carried on; unless the corporation would discharge the workmen in question and employ the defendants. And if the corporation did not yield to their demands, the defendants and their associates would in like manner represent to and threaten all persons dealing with the corporation; and that they could and would so control, boycott and injure the business customers of such persons as through fear, and by the to be threatened and concerted withdrawal of the patronage of the defendants, and by stopping and preventing the patronage of others through threats and intimidations, and by other unlawful means, to compel such customers, though against their will, to cease doing business with the subscribers and others, patrons of the corporation; and that the defendants would not give up or abandon these proceedings to injure the business of the corporation until they had either destroyed said business and prevented it from being carried on, or until the corporation should comply with their demands; and should further pay to the defendants a large sum of money, viz,, $500, to defray the expenses of the defendants and their associates in so carrying out the con-

spiracy. It was then charged that such demand was made on the corporation and was not complied with; that, thereupon, the agreed representations and threats were made to the corporation, and that the corporation still refusing to yield, the agreed representations and threats were made to the subscribers and patrons of the corporation, &c.

The second count alleged the object of the conspiracy to have been to injure and oppress, and to reduce to beggary and want, certain employees of the corporation, naming them, and to deprive them of their employment, and to prevent them from getting employment elsewhere, and to force the corporation, against its will, to discharge such persons. The means of accomplishing these purposes are then set out, and are similar to those set out in the first count.

In the third count the object as alleged was by indirect means to impoverish the Carrington Publishing Company, as a corporation engaged in publishing a daily paper, called the "Journal and Courier," a newspaper and advertising medium; and the means agreed upon were by lessening and destroying the circulation of the newspaper, and by inducing by threats and persuasion, subscribers, advertisers and others to desist from further patronizing the newspaper.

The fourth count was like the third, with the additional allegations that the defendants induced one person to discontinue his subscription to the newspaper, and attempted to induce sundry other persons to abstain from advertising therein; and that the corporation was greatly damaged.

The fifth count alleged that the defendants conspired together to impoverish one Alfred W. Gleason, to reduce him to want and beggary, and to hinder and deprive him from using and exercising his trade and business as a printer in the employ of the corporation, by inducing and causing by threats and persuasions the corporation to discharge him from its employ and thereafter to refrain from employing him.

The sixth count was like the fifth except that two other persons were named with Gleason as the persons to be injured.

· The defendants demurred to the complaint, but the court (*Stoddard, J.,*) held it sufficient. They then severally pleaded not guilty, and the case was tried to the jury, and a verdict of guilty rendered against the defendants Glidden, McNamara and Mulcahy, and of not guilty as to the defendant Busche. The verdict was taken separately as to each defendant on each count. The defendants who were convicted appealed to this court on the ground of error in the overruling of their demurrer, and in the rulings with regard to evidence, and also on the ground that the verdict was against the evidence. The evidence, which was given in full in the finding, is omitted here. The following finding of the facts was made on the appeal.

On the trial the State claimed that a controversy existed between the members of an association known as " Typographical Union, No. 47, " and the Carrington Publishing Company, and that a criminal conspiracy had been entered into by the accused among themselves and with other persons, members of the association; that two of the defendants, Glidden and McNamara, had taken the application of one Skinner, who was employed by the Carrington Company, to become a member of the union; that one Kidd was a member of the union and a co-conspirator with the defendants; that Skinner had an interview with Kidd and Glidden at which it was attempted by them to induce him to take part with the union in the controversy with the Carrington Company; that subsequently Skinner had an interview with Glidden, McNamara, and one Mailhouse (who either then was, or shortly before that time had been, a member of the union, and who was claimed by the State to be a co-conspirator with the defendants,) in reference to joining the union, and also in reference to its difficulty with the. Carrington Company; and that during the continuance of the conspiracy and for the purpose on the part of the conspirators of carrying it into full effect, Skinner had several interviews with Kidd and certain other of the conspirators, including Glidden, and had one interview with Kidd alone, in the presence of none of these defendants, on these subjects. At

that interview certain statements of Kidd as to the manner by which the conspirators intended to accomplish the objects of the conspiracy were offered as against Glidden only and the following questions and answers were put to Skinner.

*Q.* "Anything said about boycotting the Courier?" *A.* "Yes. He referred to the News boycott, and stated that he did not believe the Carrington Publishing Company would fight them as the News did." *Q.* "What was said to you by Kidd at this time about how they would carry on the boycott on the Courier?" *A.* "He said they would do the same as they had in the News case, and appeal to the merchants to take their advertisements out, and appeal to the subscribers." *Q.* "Anything said about the expenses of the boycott?" *A.* "He said they would not do as they had done in the News case, but if they had another battle they would have to pay the expenses of the boycott." All of these questions and answers were objected to and ruled in, and exceptions taken.

As one of the means to carry the conspiracy into effect the State claimed that Glidden distributed circulars like the following (referred to throughout the case as exhibit I) : "A word to the wise is sufficient. Boycott the Journal and Courier!" and to prove that he did so distribute them, after offering evidence to prove that he had been active in attempting to induce the public not to patronize the Courier, the State offered one Blakeman as a witness, who testified that on one of the most frequented streets in the city of New Haven, one evening he saw two persons passing, one of whom was Glidden, and the other he did not know; that these two persons were walking up and down the street in company and close together, and that from between them copies of the circular were from time to time dropped on the public sidewalk, but the witness was unable to say which of them dropped the circulars. Thereupon the State offered the circular in evidence, the defence objected, it was ruled in, and exception taken.

On the trial the State claimed that as a part of the case there was a conspiracy to extort money, and after having

offered evidence tending to show that Glidden and the other defendants, constituting a committee of the union, had threatened to conduct themselves in the same manner towards the Carrington Publishing Company that they had previously done towards the News, and had referred the officers of the Carrington Company to their course of conduct in their controversy with the News, offered to show what their course of action with the News had been, and as part of such evidence offered one Fowler, the business manager of the News, who testified that a committee of the union, composed of Glidden, Mulcahy and others, came to him and presented a written demand in the form of a contemplated agreement, which was as follows, (referred to throughout the case as exhibit K.) : "Agreement between the Morning News Company and the joint committee representing the Trades' Council, Knights of Labor and Typographical Union, of New Haven. The Morning News Company acknowledges the right of labor organizations to fix the price of labor for its members, and subscribes to the following articles : 1. The Morning News Company to discharge from their employ all non-union compositors, including John T. Hathaway, at the close of the present week. 2. To employ none but members of the Typographical Union, and permit them to work under such chapel rules as they may adopt under the auspices of the Typographical Union. 3. The Morning News Company to pay to the joint committee, above named, the sum of $500, as part of the expense of the strike and boycott brought on by their refusal to recognize the demands of organized labor, thereby causing the strike. 4. The joint committee, above named, agree, in consideration of the fulfillment of the foregoing articles on the part of the Morning News Company, to cause to be issued official notice of the repeal of the boycott against the Morning News. 5. The members of the joint committee, representing the Typographical Union, agree to supply a proper complement of capable compositors, including a foreman. 6. Notice of the above to be published in the Workmen's Advocate."

This paper was objected to generally, but was received in evidence, and the defence excepted. During the interview when this paper was submitted the subject matter of the News paying the $500 was talked over between the committee and Fowler. It was further testified that Glidden and Mulcahy personally were not in favor of pressing the money demand, but the committee, several in number, finally concluded to let it stand. On the cross-examination of Fowler his attention was called to another interview between himself and Glidden taking place at a time subsequent to the interview called for by the State, and to which the State had not on the direct examination of Fowler referred or alluded, and Fowler was asked to state what Glidden at such subsequent interview said upon this subject of money demand from the News. This inquiry was objected to and excluded, the defense excepting.

The State claimed and offered to prove that Glidden and his associates, constituting a committee representing the Typographical Union, called upon the officers of the Carrington Publishing Company, and made certain demands in reference to the Courier office becoming an union office, and threatened in case their demands were refused to boycott the Courier, and to deal with the Carrington Company as they had dealt with the News.

For the purpose of showing what was meant and understood by the threat to deal with the Courier as they had dealt with the News, the State, among other things, offered to show that Glidden and his associates made a money demand of the News, and that Glidden personally was the one who made the demand, and offered Fowler as a witness, who testified that Glidden handed to him a paper containing the following communication sent to the publishers of the News and signed by a committee of the union, (referred to throughout the case as exhibit L):

"TRADES' COUNCIL OF NEW HAVEN, NEW HAVEN, CT., Jan. 25, 1886.

"The Morning News Co.: Gentlemen—Having received from you no answer to the terms proposed by the committee

at the request of your representative, we consider the same to have been rejected, and at a meeting of the committee yesterday it was decided that you should be charged, in addition to the indemnity mentioned in said terms, fifty dollars per week after the present week, as a just share of the expense incident to the continuance of the boycott."

The State claimed to have shown that these written and published demands upon the News Company had come to the knowledge of the officers of the Carrington Company prior to the demand upon them by Glidden, and that Glidden knew when he made the demands upon the latter company that the officers knew of the demands before that time made upon the News.

The State claimed that one Mailhouse was a co-conspirator with the defendants, and, after having shown interviews concerning the subject of the conspiracy in which Glidden and the other defendants participated with Mailhouse as representing the union, offered Judge Deming as a witness, to show in effect that Mailhouse, in the trial of this case in the city court, swore that he printed circulars exhibited in this case during the existence of the conspiracy and while it was being carried on, and in furtherance thereof. Mailhouse had been previously called as a witness and refused to testify on the sole ground that his testimony would tend to criminate himself, and was on that ground excused from testifying. This testimony was objected to, ruled in, and exception taken. The counsel for the State were understood by the court to say that the case referred to was the present case in the City Court, but, in making up the record for the Supreme Court it was discovered that there was a misunderstanding, and that in fact the case in the City Court, in which Mailhouse testified, was a case growing out of the alleged conspiracy, but against Glidden only.

The State offered one Bertha Palm as a witness, who testified, against the general objection of the defendants, that she overheard conversation between five or six printers, among whom was the defendant Mulcahy, the others not identified, in which it was stated, but by which she could

not say, that they were paying fifty cents a week for the expenses of the Courier boycott, and that it would be paid for by the Courier. She also stated that all of those who were present belonged to the union. After the witness had finished her testimony the defense moved that her testimony be rejected. The court ruled that the evidence was admissible against Mulcahy alone, and to that ruling the defense excepted.

One of the grounds of the appeal being that the verdict was against the evidence, the judge certified that in his opinion the evidence did not warrant a verdict of guilty against any of the defendants so far as the alleged conspiracy to extort money was concerned.

*J. T. Platt* and *T. H. Russell*, with whom was *J. T. Moran*, for the appellants.

*First.*—As to the information:

1. The defendants are charged with the crime of "conspiracy," and we will first inquire what is necessary to constitute the offense. The judge in the court below in his charge to the jury defined a criminal conspiracy as a "combination, agreement and confederation of two or more persons to accomplish by concerted means an unlawful purpose, or to effect a lawful purpose by unlawful acts and means." *State* v. *Rowley*, 12 Conn., 112; *Com.* v. *Hunt*, 4 Met., 111. This antithesis was invented by Lord DENMAN in *Rex* v. *Jones*, 4 B. & Ad., 345, (1832), and is now understood to contain a limitation, and not a definition of what combinations are criminal. See *Reg.* v. *Peck*, 9 Ad. & El., 686, (1839); *Reg.* v. *King*, 7 Q. B., 782, (1844); Wright on Conspiracies, 14. The difficulty with regard to the definition arises from the word "unlawful," which is used in different senses, as follows: 1st. Something prohibited by the criminal law, and punished by the infliction of a criminal sanction. 2d. Something wrongful, and subjecting the wrong-doer to a civil sanction. 3d. As applied to certain contracts, as in restraint of trade, &c., which the law will not enforce. To refer to all the cases in which an attempt

has been made to define what combinations may and may not amount to a criminal conspiracy, would be as laborious as it would be futile. The case of *State* v. *Rowley*, (1837), was a conspiracy to cheat and defraud. By statute (Rev. of 1835, tit. 21, sec. 114,) the act which the accused combined to do was made a crime, and punishable by fine or imprisonment or both. Whatever may be the doctrine of the early cases, the later and better considered American cases hold that a combination is not criminal unless it be for acts or omissions, either as ends or means, which would be criminal in themselves. 3 Greenl. Ev., Redf. ed., § 90*a ; Com.* v. *Hunt,* 4 Met., 124; *Com.* v. *Eastman,* 1 Cush., 189; *Com.* v. *Shedd,* 7 id., 514; *State* v. *Rickey,* 4 Halst., 293; *Rex* v. *Pywell,* 1 Stark. R., 402; *Rex* v. *Turner,* 13 East, 228; *State* v. *Straw,* 42 N. Hamp., 393; *State* v. *Jones,* 13 Iowa, 269, 272; *State* v. *Potter,* 28 id., 554; *State* v. *Stevens,* 30 id., 392; *Alderman* v. *People,* 4 Mich., 414; Wharton's Crim. Law, 7th ed., § 2288; Wright on Conspiracy, 62.

2. Unlike other offenses, no overt act is necessary to constitute the crime of conspiracy. The unlawful ,agreement makes the crime, and it is complete the moment the agreement is entered into. The overt acts set forth in the information are evidence merely, or facts in aggravation and surplusage. DEWEY, J., says in *Com.* v. *Eastman,* 1 Cush., 223, decided in 1848 :—" The offense of conspiracy in one respect is doubtless peculiar. It may, unlike most offenses, be committed without any overt act. A criminal purpose to do an unlawful act, or to do a lawful act by criminal means, mutually assented to or agreed upon by two or more persons, may, by such assent and agreement, ripen into crime, although no act be done in pursuance of it." In *State* v. *Ripley,* 31 Maine, 388, TENNEY, J., in discussing this question says :—" No overt act, in carrying out the designs of those who have conspired, confederated and agreed together for such object, is necessary to make up the crime; it may be fully complete without it. The conspiracy is the gist of the indictment, and, although nothing be done in prosecution of it, it is a complete and consummate offence of itself." *State*

v. *Keach*, 40 Verm., 113; *Com.* v. *Wallace*, 16 Gray, 222; *Alderman* v. *The People*, 4 Mich., 414; Reporter's note to *Lambert v. The People*, 9 Cowen, 625.

3. The facts alleged can have no greater effect because attended by a cloud of qualifying adverbs and adjectives. The acts of the defendants in violation of law, and not the vocabulary of the pleader, constitute the crime. SHAW, C. J., in *Com.* v. *Hunt*, 4 Met., 128; *State* v. *Fields*, Martin & Yerger, 137. GRAY, C. J., in *O' Callaghan* v. *Cronan*, 121 Mass., 114, said :—" The allegations of conspiracy, illegality, falsehood and malice will not support this action, unless either the purpose intended, or the means by which it was to be accomplished, is shown to be unlawful." *Adler* v. *Fenton*, 24 How., 407; *Bowen* v. *Matheson*, 14 Allen, 499.

4. A conspiracy being an agreement to commit a criminal or unlawful act, the criminality must exist either in the principal act (the end) or the means by which it is to be accomplished. The information must, therefore, set out directly and not by way of inference, the criminal or unlawful act, either in the end or means. DEWEY, J., in giving the opinion of the court in *Com.* v. *Shedd*, 7 Cush., 514, says :—" It is well settled that a general allegation that two or more persons conspired to effect an object criminal in itself, as to commit a misdemeanor or a felony, is quite sufficient, although the indictment omits all charges of the particular means to be used. It is equally well settled that a general charge of a conspiracy to effect an object not criminal is not sufficient. The charge of such a conspiracy is to be accompanied with the further statement of the means the conspirators concerted and agreed to use to effect the object, and those means must appear to be criminal. The indictment in the present case does not charge a conspiracy to do a criminal act, or to effect an object by any criminal means set forth upon the face of the indictment." The judgment was arrested. In *State* v. *Jones*, 13 Iowa, 270, decided in 1862. the court in passing upon the indictment says :—" In the more modern American adjudications there has been a tendency to greater strictness in the presentment and trial of

conspirators * * * They hold that it should appear on the face of the indictment, that the object of the conspiracy is a criminal one, or else, if the purpose thus disclosed does not import a crime, then other facts should be alleged and set forth, so as to show that the means to be employed are criminal, thereby withdrawing the crime of conspiracy from the limitless field of wrongful acts, where the old authorities had allowed it to go, to the more circumscribed range of the criminal code, either as a means or an end." In the states of Maine, New Hampshire, Massachusetts, Vermont, New York, New Jersey and Pennsylvania, it has been settled that a general charge of a conspiracy to effect an object not criminal, is not sufficient, and that a charge of such a conspiracy is to be accompanied with the further statement of the means agreed to be used to effect the object, and those means must appear to be criminal." *Lambert* v. *The People*, 9 Cowen, 578; *State* v. *Keach*, 40 Verm., 113; *State* v. *Crowley*, 41 Wis., 271; *U. States* v. *Cruikshank*, 92 U. S., 542, 558; 1 B. & H. Leading Crim. Cases, 264; *Com.* v. *Eastman*, 1 Cush., 189; *Com.* v. *Shedd*, 7 id., 514; *State* v. *Ripley*, 31 Maine, 386; *State* v. *Hewett*, id., 396; *State* v. *Roberts*, 34 id., 320; *State* v. *Burnham*, 15 N. Hamp., 396; *Hartman* v. *Com.*, 5 Penn. St., 60; *State* v. *Rickey*, 4 Halst., 293.

5. The facts and circumstances constituting the alleged offense must be set out in the information, so that the court can see whether or not they are criminal. "The special manner of the whole fact ought to be set forth with such certainty, and so specifically, that it may judicially appear to the court that the indicters have gone upon sufficient premises, in order that the court may know what judgment is to be pronounced upon conviction, and that the defendant may clearly understand how much he is called upon to answer, and that posterity may know what law is to be derived from the record." 1 Archb. Pl. & Prac., 85, 283; *State* v. *Wilson*, 30 Conn., 504. In *Lambert* v. *The People*, 9 Cowen, 597, the court says: "If this be true, and I believe it is, that no general rule defining the offense of con-

spiracy exists in the law, it presents a lamentable exception from the principles of our whole system. If the offense is to be declared after the fact, and cannot be ascertained before it, we may apply to ourselves the maxim that miserable is the condition of a people where the law is so vague and uncertain as to rest only in the breast of the judge. * * If, in addition to the uncertain and fluctuating condition of the criminal law in this respect, it should also be settled that the form of the accusation may be so generally vague and indefinite as not to apprise the accused of the specific offense he is charged with, then will be completed an instrument of tyranny and oppression worthy of a star chamber or an inquisition."

6. No branch of the law has gone through so many transformations as that relating to conspiracy. In its present form it had its origin and the impulse to its growth in the Star Chamber (see *Poulterer's Case*, 9 Co. Rep., 55 *b*)—a court which legislated as well as judged, and which, as Lord Clarendon says in his history of the Great Rebellion, "held for honorable that which pleased, and for just that which profited." He adds that the foundations of right were never more in danger of being destroyed. At first used to bring popular leaders to the block, the law of conspiracy has in later times been invoked to suppress combinations among workmen to better their condition. Many of the most eminent judges in this country have looked upon it with disapproval, and expressed a determination to restrict rather than extend it. See 2 Stephen's History of the Criminal Law, 227, and cases before cited. In England the danger as regards combinations of workmen is removed by the third section of the Conspiracy and Protection of Property Act of 1875, which provides as follows: " An agreement or combination by two or more persons to do, or procure to be done, any act in contemplation or furtherance of a trade dispute between employers and workmen, shall not be indictable as a conspiracy if such act committed by one person would not be punishable as a crime." So far as Connecticut is concerned the question is open. We have no deci-

sion of controlling effect, and there is none reported relating
to a trade dispute.    In the case of the Hartford carpet
weavers, *Thompsonville Carpet Mfg. Co.* v. *Taylor et al.*, an
action on the case in the nature of conspiracy, tried at the
January term, 1836, of the Superior Court for Hartford
County, before WILLIAMS, C. J., and a jury, there was a
verdict for the defendants.    (See a reference to this case in
*Master Stevedores' Association* v. *Walsh*, 2 Daly, 5.)    The
case of *State* v. *Rowley*, 12 Conn., 112, (1837), was an infor-
mation for conspiracy to cheat and defraud.    By statute
the act which the accused combined to do was made a crime
and punishable by fine or imprisonment or both.    BISSELL,
J., in giving the opinion of the court, indulged in some gen-
eral observations not at all necessary for the decision of the
case.    He says: " That many acts which, if done by an indi-
vidual, are not indictable, are punished criminally when
done in pursuance of a conspiracy among numbers, is too
well settled to admit of controversy.    Thus, a conspiracy
to slander a man by charging him with a crime, or with
being the father of a bastard child, is an indictable offense.
*Child* v. *North*, 1 Sid., 68; *The Queen* v. *Best*, 1 Stra., 193;
*The King* v. *Parsons*, 2 Ld. Raym., 1168.    Conspiracies
among journeymen to raise their wages, and many other
instances which might be put, stand on the same ground.
There can be no doubt, says Hawkins, but that all confed-
eracies whatsoever, wrongfully to prejudice a third person,
are highly criminal at common law.    Hawk. P. C., lib. 1,
c. 72, s. 2."    The opinion concludes as follows: " It is un-
necessary to pursue this inquiry further, as we are of opin-
ion that the case falls clearly within the statute ; and on that
ground the count must be sustained."    As to the authority
of Hawkins, upon whom Judge BISSELL relied, Wright
in his work on Criminal Conspiracy, p. 11, says: " But
in 1717 Hawkins's Pleas of the Crown was published,
and in that work it was stated ' that there can be no doubt
but that all confederacies whatsoever wrongfully to preju-
dice a third person, are highly criminal at common law,'—a
proposition to which unless by ' wrongfully ' he meant by

criminal means, the authorities cited by him, with the exception of the argument of counsel as reported in Keble, furnish little or no support." Judge BISSELL quotes also from the *dictum* of GROSE, J., in the case of *Rex* v. *Mawbey*, 6 T. R., 636. Sir JAMES STEPHEN, one of the judges of the Queen's Bench Division of the High Court of Justice, in his History of the Criminal Law of England, vol. 3, p. 209, says: "1. No case has ever been cited in which any person was, for having combined with others for the raising of wages, convicted of a conspiracy in restraint of trade at common law before the year 1825. There is indeed one case, that of the journeyman tailors of Cambridge, which may perhaps be an authority the other way, but this appears doubtful. 2. There are some *dicta* to the effect that such combinations would be unlawful. The most important of these is the *dictum* of GROSE, J., in *Rex* v. *Mawbey:* 'In many cases an agreement to do a certain thing has been considered as the subject of an indictment for a conspiracy, though the same act, if done separately by each individual without any agreement among themselves, would not have been illegal. As in the case of journeymen conspiring to raise their wages; each may insist on raising his wages if he can, but if several meet for the same purpose it is illegal, and the parties may be indicted for a conspiracy. This dictum is an illustration not necessary to the decision of *Rex* v. *Mawbey*, and founded as it seems to me upon the case of the Cambridge tailors."

7. There is no intrinsic efficacy in the word "conspiracy," or in the word "confederacy," or in the word "combination." Wright on Conspiracies, 57. The words "threats," "intimidations," "boycott," "oppress" and "impoverish," in the information, are not terms of art, and they are consistent with either legality or illegality in the conduct to which they refer. Wright on Conspiracies, 57; *O'Connell* v. *The Queen*, 11 Cl. & Fin., 162, 234; *Embry* v. *Com.*, 79 Ky., 439. The case of *Reg.* v. *Rowland*, 17 Q. & B., 671, is in point. The information contained twenty counts, and all but the 16th, 17th and 19th were framed on the 4 Geo. 4, c. 34, or

on the 6 Geo. 4, c. 129.    The 16th, 17th and 19th counts were quite as strong as some of those upon which the defendants were convicted; but the judges of the Queen's Bench agreed in thinking they were too vague, and there was a rule *nisi* to arrest the judgment upon them unless a *nolle prosequi* was entered.    The substance of these counts is given in Wright on Conspiracy, 20.    See also *Reg.* v. *Shepherd*, 11 Cox C. C., 325.

8. Facts constituting a criminal offense are not alleged in any count of the information, nor upon the facts set forth was there any violation of law to the injury of another for which a civil action could be sustained.    *Payne* v. *Western & Atlantic R. R. Co.*, 13 Lea, (Tenn.,) 507; *Heywood* v. *Tillson*, 75 Maine, 225; *Bowen* v. *Matheson*, 14 Allen, 499; *Com.* v. *Hunt*, 4 Met., 111; *Master Stevedores' Asso.* v. *Walsh*, 2 Daly, 1; *Orr* v. *Home Mut. Ins. Co.*, 12 La. Ann., 255.

*Second.* The verdict was against the weight of evidence. 1. The Palm and Kidd statements are the only direct intimations by any one of any intent to extort money from the *Courier.*    The Palm testimony was admitted against Mulcahey alone; so that, so far as McNamara and Glidden are concerned, there was no testimony that any person whatsoever had ever hinted or suggested any intention to extort money, except the remarks of Kidd, which were in no way connected with any act, and were random guesses made before any controversy had arisen.    The Palm testimony was of very little weight, and will be noticed later on.    Such testimony, if admissible at all, is utterly flimsy and worthless, and wholly insufficient to support a conviction.    The testimony of Carrington, Baldwin and Conklin is simply to the effect that McNamara referred to the *News* boycott, and to the amount which it had cost the *News*, as a reason why the *Courier* should yield to the threatened boycott, and Mr. Carrington says he interpreted that as a threat to demand money.    Pratt says more directly that they threatened to treat the *Courier* as the *News* had been treated, but it is evident that he is merely giving his construction of the lan-

guage used. Mr. Carrington testified that there had never been any direct or personal demand or suggestion made to him or to any officer of his company by any of the accused persons that the *Courier* should pay money. We say that a mere reference to the *News* boycott, and to the amount it had cost, was not to be interpreted as a threat to demand money, and in fact could not have been so interpreted at the time, because it was then well known in the *Courier* office that the *News* boycott had been settled without the payment of money. The accused had protested against the demand being made even in the *News* case. The context and the whole drift of the conversation shows that it was not intended to refer to any demand for expenses, because the remainder of the conversation refers to the injury incident to the loss of advertising patronage. It is grossly unfair to wrest the general words from their surroundings, and strain their meaning to cover ideas manifestly not in the minds of the parties. If there was then any intention to produce an effect upon the minds of the *Courier* proprietors by such a threat, it passes belief that there should have been no direct mention of the subject, and no implied mention except by reference to a circumstance in which such a demand had resulted in nothing. See remarks of BIGELOW, C. J., in *Com.* v. *Shepard*, 1 Allen, 586, and of MORTON, J., in *Jordan* v. *Osgood*, 109 Mass., 461.

2. The evidence as to the question of a conspiracy to impoverish the Carrington Publishing Company and its employees was of very little weight, and wholly insufficient to support a conviction.

3. It is well settled in this state that "it is the prerogative of the court to grant new trials in cases where the verdicts are not only against the weight of evidence, but against the evidence." *Newell* v. *Wright*, 8 Conn., 319, 325; *State* v. *Lyon*, 12 id., 488. There is a certificate from the presiding judge that in his opinion the evidence in the case did not warrant a verdict of guilty against any of the defendants, so far as the alleged conspiracy to extort money

is concerned. It is submitted that there was no evidence to support the verdict of guilty upon any of the counts.

*Third.* Exceptions to testimony.

1. The evidence in regard to what Kidd said to Skinner about the expenses of the boycott was not admissible. (1) Because it was in the absence of the accused. (2) Because the declarations did not accompany any act done in pursuance of the conspiracy. (3) Because there was no evidence that Kidd was in any way connected with the boycott. There was nothing to contradict his own statement that he knew nothing about it. The declarations of a conspirator not on trial against an alleged conspirator who is on trial, made in the absence of the latter, are not evidence against the latter to establish the conspiracy. *Cowles* v. *Coe,* 21 Conn., 229, 234; 1 Phill. Ev., 103; 2 Stark. Ev., 403. To make declarations admissible they must accompany acts done in pursuance of the conspiracy. "A mere gratuitous assertion inculpating himself and others, although made by a co-conspirator, would not be evidence against any one but himself." 2 Stark. Ev., 405; 3 Russell on Crimes, 160; 1 Green. Ev., §§ 110, 111; 1 Phil. Ev., 94. It seems that mere detached declarations and confessions of persons not defendants, not made in the prosecution of the object of the conspiracy, are not evidence to prove its existence." 2 Stark. Ev., 327; 3 Russell on Crimes, 167; Stephen's Digest of Law of Ev., 46, art. 4; *O'Kelly* v. *O'Kelly,* 8 Met., 440.

2. The court erred in admitting the testimony of Blakeman. He testified that late one evening he observed two men, one of whom was Mr. Glidden, pass down Chapel street, and that from between these two men circulars were being dropped upon the sidewalk. The witness did not see Glidden drop any of the circulars, but did see the other party drop them. It does not appear that this other party was in any way connected with Glidden or any of the other defendants, nor does it appear that Glidden or any of the other defendants had combined with this other party for the purpose of distributing circulars or to do any act in pursu-

ance of a conspiracy. Before persons on trial for a conspiracy can be charged with the acts of another, it must be shown that that other was in some way connected with the conspiracy. Proof of combination is essential to make such acts admissible. 3 Russell on Crimes, 160; 1 Greenl. Ev., § 11; 1 Phill. Ev., 9th ed., 200.

3. Exhibit *K* was not admissible because it was evidence of an independent and entirely distinct offense. The *News* transaction was entirely distinct from the *Courier* controversy. Because a set of men have committed one crime it is not proof of the commission of another. "In the proof of this offense, as well as of others, the evidence will be confined to the particular allegations in the indictment." 3 Greenl. Ev., § 96; *Reg.* v. *Steele*, Car. & Marsh., 337. "An averment in an indictment for a conspiracy that the defendants conspired to defraud *A* is not supported by proof that they conspired to defraud the public generally, or any individual whom they might meet and be able to defraud." *Com.* v. *Harley*, 7 Met., 506; *Com.* v. *Kellogg*, 7 Cush., 473; *Jordan* v. *Osgood*, 109 Mass., 461; Best on Ev., 32, 96, 97, 283, 286; Roscoe's Crim. Ev., 81. The same remarks apply to exhibit L, which was improperly admitted.

4. The court erred in excluding the questions addressed to Mr. Fowler as to the general history of the *News* and its conduct, and especially in excluding the evidence as to other meetings of the accused with representatives of the *News* in reference to the money demand. Evidence having been introduced in regard to the *News* boycott, the accused were entitled to have the whole transaction shown as affecting the weight of the evidence, and particularly the causes which led to the demand for money in that case. It was testified to by Fowler that it was claimed that there had been a breach of contract in the case of the *News*. If so, the demand for money indemnity might be legitimate. The accused should have been allowed to show the difference in the circumstances of the two cases, and especially circumstances which might tend to qualify the demand for money made in the *News* case.

5. The court erred in overruling the objection to the testimony of Judge Deming as to what Mailhouse said in the City Court as to the printing of cards and circulars, and in admitting that testimony. (1) It was inadmissible under the general doctrine governing the admission of the acts and declarations of co-conspirators. It was simply evidence as to what Mailhouse had been heard to say as to the share which the defendants, Glidden, Mulcahy and McNamara, had in the execution of the common design. The declaration of a conspirator against his co-conspirator, narrative of past occurrences and of what had been done, are not evidence against the co-conspirator, he not being present when the declaration was made. *Cowles* v. *Coe*, 21 Conn., 230 ; 2 Phill. Ev., 179 ; 2 Burr's Trial, 578 ; Stephens' Ev., 46 ; 1 Greenl. Ev., § 110 ; *State* v. *Larkin*, 49 N. Hamp., 44. (2) The evidence of Judge Deming as to what Mailhouse testified to in the City Court was inadmissible, for the reason that the prosecution in the City Court in which Mailhouse testified was not between the same parties, and the point in issue was not the same as in this case—elements strictly necessary to render such testimony admissible. 3 Russell on Crimes, 249 ; *Rex* v. *Carpenter*, 2 Show., 47 ; 1 Phill. Ev., 237 ; *Kendrick* v. *State*, 10 Humph., 479 ; *State* v. *Hooker*, 17 Verm., 658 ; 2 Stark., 211, note to *Rex* v. *Smith*. And this rule seems to be confined strictly to cases where a witness who testified in a former trial is dead at the time of the second trial. *Crary* v. *Sprague*, 12 Wend., 41 ; *Brogy* v. *Com.*, 10 Grat., 722 ; *People* v. *Newman*, 5 Hill, 295. In *Finn* v. *Com.*, 5 Randolph, 701, the court limits the rule strictly to civil cases. In the present case the witness was present in court, but refused to testify on the ground that it might criminate himself, and was thereupon excused by the court.

6. The court erred in admitting the testimony of Bertha Palm. The declarations which she overheard were merely parts of a random conversation, and it is not pretended that they accompanied acts done in pursuance of the conspiracy. They were not made by any of the accused. There is no proof that Mulcahy heard them. If he did hear them, he

was not called upon to deny them. Declarations made by one person in the presence of another are not evidence against that other unless under such circumstances that his silence implies consent thereto. Bigelow on Estoppel, 497. A member of an association is not, merely because of his membership, liable for a conspiracy entered into by the association. *Johnson* v. *Miller*, 63 Iowa, 529.

*J. W. Alling*, for the State.

CARPENTER, J. This is an information for a conspiracy. The defendants demurred to the information; their demurrer was overruled. They then pleaded not guilty; the verdict was guilty as to all but one of the defendants; the defendants convicted appealed. The appeal raises a question as to the sufficiency of the information, and also some questions of evidence.

Is an offense sufficiently charged in the information? There are six counts. The verdict was taken separately as to each defendant on each count. The three defendants who were convicted were found guilty on all the counts.

[The judge here states the substance of the several counts, which is given *ante*, p. 48.]

We assume that it was the intention of the attorney to charge but one offense, as all the counts are manifestly based upon one and the same transaction. The first count seems to embrace the substance of all the others, so that we have no occasion further to consider the different counts separately.

We will next inquire—what is a criminal conspiracy? We will not attempt to formulate in a single sentence a definition which will embrace every case of conspiracy which the law will regard as criminal. Such a definition will of necessity embrace not only a great variety of subjects, but also many distinct and independent classes of subjects. We shall therefore have a better understanding of the matter if we consider each part of such a definition by itself;

each part having reference to a class of objects or purposes which may form the subject of a criminal conspiracy.

In the first place, it seems to be generally conceded that if two or more persons confederate and agree together to commit some crime or misdemeanor, such confederation or agreement is itself an offense. Here we are hardly on debatable ground; and here we will pause and apply this partial definition to this information.

A statute passed in 1878 provides that " every person who shall threaten or use any means to intimidate any person, to compel such person, against his will, to do or abstain from doing any act which such person has a legal right to do, or shall persistently follow such person in a disorderly manner, or injure or threaten to injure his property, with intent to intimidate him, shall upon conviction be liable to a fine not exceeding one hundred dollars, or imprisonment in the county jail six months. " Session Laws of 1878, ch. 92.

This statute was unquestionably designed as a substitute for the act of 1877, which doubtless had its origin in the apprehension which prevailed throughout the country at the time of and soon after the trouble on the Pennsylvania Railroad, during which there was such an immense destruction of property at Pittsburg. The operation of that act was limited to railroad, gas and telegraph companies. The act of 1878 removed the limitation, and was designed to protect all persons, natural or artificial, employers or employees, in the management and control of their own business. It simply extended the remedy. We cannot therefore limit the act of 1878 to subjects embraced in the act of 1877, without doing violence to the manifest intention of the legislature.

Do the acts which, it is alleged, the defendants conspired to do, fall within the prohibition of the act of 1878 ? They proposed to threaten and use means (the boycott) to intimidate the Carrington Publishing Company, to compel it against its will, to abstain from doing an act, (to keep in its employ the workmen of its own choice,) which it had a

legal right to do, and to do an act, (employ the defendants and such persons as they should name,) which it had a legal right to abstain from doing. There can be but one answer to the question—the acts proposed are clearly prohibited by the statute.

We might perhaps stop here; but the argument of the case took a much wider range, and the case itself will justify, and the times in which we live seem to require, a more extended examination of the subject.

Conspiracies against the government, and conspiracies to hinder or obstruct the administration of justice, which are also regarded as criminal conspiracies, need not be considered in this case.

It has often been said that a conspiracy to effect an unlawful purpose, or a lawful purpose by unlawful means, is an offense. But this is said to be a limitation rather than a definition. It certainly lacks definiteness. Many acts are said to be unlawful which would not be the subject of a criminal conspiracy. Other acts are unlawful because they are in violation of the criminal law or of some penal statute. If the ends or the means are criminal in themselves, or contrary to some penal statute, the conspiracy is clearly an offense. Between these two extremes a great variety of cases may arise, many of which ought not to be regarded as criminal. Suppose two or more boys, for instance, agree to go upon another's land; the proposed act is or may be a trespass, and therefore unlawful. If they do not go no harm is done; if they do go they are or may be liable civilly, but no one would seriously contend that in either case they would be liable criminally for the conspiracy. But suppose two or more conspire unjustly and wrongfully to deprive another of his liberty or property; then, as we shall hereafter see, the criminal law may take cognizance of the act. Of course it is difficult if not impossible to define accurately and clearly in advance what would and what would not be an offense. Hence the difficulty of regulating by statute in all cases the law of criminal conspiracy. But this difficulty is not confined to these cases. There are other offenses at

common law that are not defined by any statute. The statute prescribes a penalty for such cases without attempting to define in advance the acts which shall constitute an offense. It is left for the court to determine in each particular case whether it is or is not an offense. For instance, it has been held an offense at common law for a prisoner to escape from jail, and for one to solicit another to commit the crime of adultery. Neither of these acts is forbidden by statute, yet it was held in each case, after the act, that it was an offense. The supposed hardship is only apparent; it is not real. The danger that an innocent man will be punished criminally for a conspiracy, because the act was not forbidden by the written law, is very small. It is hardly supposable that prosecutions will be instituted and sustained by the court and jury unless the acts done or contemplated are clearly illegal and morally wrong; so much so as to leave little or no room for a right-minded man to doubt.

If we were to attempt to give a rule applicable to this branch of the subject, we should say that it is a criminal offense for two or more persons corruptly or maliciously to confederate and agree together to deprive another of his liberty or property. Such a rule is proximately correct and practically just.

Now if we look at this transaction as it appears on the face of this information, we shall be satisfied that the defendants' purpose was to deprive the Carrington Publishing Company of its liberty to carry on its business in its own way, although in doing so it interfered with no right of the defendants. The motive was a selfish one—to gain an advantage unjustly, and at the expense of others; and therefore the act was legally corrupt. As a means of accomplishing the purpose the parties intended to harm the Carrington Publishing Company, and therefore it was malicious. It seems strange that in this day, and in this free country—a country in which law interferes so little with the liberty of the individual—it should be necessary to announce from the bench that every man may carry on his business as he pleases, may do what he will with his own, so long as he does noth-

ing unlawful, and acts with due regard to the rights of others; and that the occasion for such an announcement should be, not an attempt by government to interfere with the rights of the citizen, nor by the rich and powerful to oppress the poor, but an attempt by a large body of workingmen to control, by means little if any better than force, the action of employers. The defendants and their associates said to the Carrington Publishing Company, "You shall discharge the men you have in your employ, and you shall hereafter employ only such men as we shall name. It is true we have no interest in your business, we have no capital invested therein, we are in no wise responsible for its losses or failures, we are not directly benefited by its success, and we do not participate in its profits; yet we have a right to control its management and compel you to submit to our dictation." The bare assertion of such a right is startling. The two alleged rights cannot possibly co-exist. One or the other must yield.

If the defendants have the right which they claim, then all business enterprises are alike subject to their dictation. No one is safe in engaging in business, for no one knows whether his business affairs are to be directed by intelligence or ignorance—whether law and justice will protect the business, or brute force regardless of law will control it; for it must be remembered that the exercise of the power if conceded will by no means be confined to the matter of employing help. Upon the same principle and for the same reasons the right to determine what business others shall engage in, when and where it shall be carried on, &c., will be demanded and must be conceded. The principle, if it once obtains a foothold, is aggressive and is not easily checked. It thrives on what it feeds on, and is insatiate in its demands. More requires more. If a large body of irresponsible men demand and receive power outside of law, over and above law, it is not to be expected that they will be satisfied with a moderate and reasonable use of it. All history proves that abuses and excesses are inevitable. The exercise of irresponsible

power by men, like the taste of human blood by tigers, creates an unappeasable appetite for more.

Business men have a general understanding of their rights under the law, and have some degree of confidence that the government through its courts will be able to protect those rights. This confidence is the corner-stone of all business. But if their rights are such only as a secret and irresponsible organization is willing to concede to them, and will receive only such protection as such an organization is willing to give, where is that confidence which is essential to the prosperity of the country?

Again. If the alleged right is conceded to the defendants, a similar right must be conceded to the promoters of the Carrington Publishing Company and those with whom they may associate; otherwise all men are not equal before the law. It logically follows that they in turn may control the business matters of the defendants—may determine what trade or occupation they may follow, whether to work in this establishment or in that, or in none at all. Obviously such conflicting claims, in the absence of law, can lead to but one result, and that will be determined by brute force. It would be an instance of the survival, not necessarily of the fittest, but of the strongest. That would be subversive, not only of all business, but also of law and of the government itself. The end would be anarchy pure and simple.

Once more. Suppose the government should assert the right in the same manner to regulate and control the business affairs of the Carrington Publishing Company, and other business enterprises, how long would the people submit to it? And yet the exercise of such a power by government would be far more tolerable than its exercise would be by secret organizations, however wise and intelligent such organizations might be; for government is established by the people and for the people, and is responsible to all the people. If it abuses its power the people have the remedy in their own hands; but if a secret organization, in the management of which the people at large have no voice, abuses its power, and is not amenable to law, where is the remedy?

It is further alleged that another purpose of the defendants was to injure and oppress John E. Skinner and seven other workmen of the Carrington Publishing Company, by depriving them of their employment. What we have already said applies equally well to this purpose of the defendants. The workmen named have just as good a right to work for the corporation. as the defendants have, and this right is entitled to the same consideration and the same protection.

Then there are these further considerations: It is a combination, not against capital nor employers, but against fellow workmen—men whose earnings are comparatively small, and who presumably need all their earnings for the support of themselves and their families. They are ordinarily poor men, and men whose entire capital consists in their trade and time. It is proposed wantonly to deprive them of a livelihood, and practically of all means of support. If a capitalist is driven from his business he has other resources, but the poor mechanic, driven from his employment, and, as is often the case, deprived of employment elsewhere, is compelled to see his loved ones suffer or depend upon charity.

It is also a combination of many to impoverish and oppress a few. The weaker party needs and must receive the protection of the law. If in any case it is criminal for many to combine to do what any one may lawfully do singly, it would seem that this would be such a case. Numbers can accomplish what one man can not—evil as well as good; and that is the reason of the combination. The law encourages combinations for good, and combinations by workmen to better their condition by legitimate and fair means are commendable and should be encouraged. But combinations for evil purposes, whether by one class of men or another, are detrimental to the public weal and cannot be regarded with favor by the courts. But combinations for good purposes may be perverted, and when their power is sought to be used to harm their fellow men, to deprive others of their just rights, then not the combination but the use of it becomes criminal. In such use there is a large element of

wantonness and malice. Any one man, or any one of several men, acting independently, is powerless; but when several combine and direct their united energies to the accomplishment of a bad purpose, the combination is formidable. Its power for evil increases as its numbers increase. No one man can drive these workmen from their situations; numbers, if allowed their will, may do it. The intention by one man, so long as he does nothing, is not a crime which the law will take cognizance of; and so too of any number of men acting separately; but when several men form the intent, and come together and agree to carry it into execution, the case is changed. The agreement is a step in the direction of accomplishing the purpose. The combination becomes dangerous and subversive of the rights of others, and the law wisely says that it is a crime.

It is no answer to say that the conspiracy was for a lawful purpose—to better their own condition, to fix and advance their rate of wages, and further their own material interest. It is certainly true that they had a right to have such a purpose, and to use all lawful means to carry it into effect. And so a purpose to acquire property is lawful so far as it contemplates lawful means only. But if it contemplates the acquisition of money by means of murder, theft, fraud or injustice, the end does not sanctify the means.

Neither will these defendants be permitted to advance their material interests, or otherwise better their condition, by any such reprehensible means. They had a right to request the Carrington Publishing Company to discharge its workmen and employ themselves, and to use all proper argument in support of their request; but they had no right to say—" You shall do this or we will ruin your business." Much less had they a right to proceed to ruin its business. In such a case the direct and primary object must be regarded as the destruction of the business. The fact that it is designed as a means to an end, and that end in itself considered is a lawful one, does not divest the transaction of its criminality.

In considering the demurrer we would not overlook the

fact that it is alleged that one object of the defendants was to extort money from the Carrington Publishing Company. It must be conceded that the exaction of money otherwise than by legal means is unlawful in a criminal sense. But the sufficiency of this information does not depend upon that allegation. It is therefore unnecessary to notice it further.

Neither do we overlook the character and magnitude of this conspiracy, as evidenced by the wholesale boycotting contemplated of the patrons of the Carrington Publishing Company. Perhaps no new or different principle applies to this part of the case. We cannot forbear remarking however that it evinces a recklessness and disregard of the rights of others seldom witnessed in business affairs. Assuming, as we do, that these defendants are honest, well-meaning men, it is difficult for us to understand how they could be willing to involve the innocent patrons of the Carrington Publishing Company in embarrassment and possible ruin merely for the purpose of furthering their cause in a controversy in which these patrons were not concerned. *Primâ facie* such conduct must be regarded as malicious and corrupt.

We will also notice that it is alleged that the conspiracy contemplated boycotting as a means to the end sought. That word is not easily defined. It is frequently spoken of as passive merely—a let-alone policy—a withdrawal of all business relations, intercourse and fellowship. If that is its only meaning it will be difficult to find in it anything criminal. We may gather some idea of its real meaning however by a reference to the circumstances in which the word originated. Those circumstances are thus narrated by Mr. Justin McCarthy, an Irish gentleman of learning and ability, who will be recognized as good authority. In his work entitled "England under Gladstone," he says:—"The strike was supported by a form of action, or rather inaction, which soon became historical. Captain Boycott was an Englishman, an agent of Lord Earne, and a farmer of Lough Mark, in the wild and beautiful district of Connemara. In his capacity as agent he had served notices upon Lord Earne's

tenants, and the tenantry suddenly retaliated in a most unexpected way by, in the language of schools and society, sending Captain Boycott to Coventry in a very thorough manner. The population of the region for miles round resolved not to have anything to do with him, *and as far as they could prevent it, not to allow any one else to have anything to do with him. His life appeared to be in danger—he had to claim police protection.* His servants fled from him as servants flee from their masters in some plague-stricken Italian city. The awful sentence of excommunication could hardly have rendered him more ·helplessly alone for a time. No one would work for him—no one would supply him with food. He and his wife had to work in their own fields themselves, in most unpleasant imitation of Theocritan shepherds and shepherdesses, and play out their grim eclogue in their deserted fields with the shadows of the armed constabulary ever at their heels. The Orangemen of the north heard of Captain Boycott and his sufferings, and the way in which he was holding his ground, and they organized assistance and sent him down armed laborers from Ulster. To prevent civil war the authorities had to send a force of soldiers and police to Lough Mark, and Captain Boycott's harvests were brought in and his potatoes dug by the armed Ulster laborers, guarded always by the little army."

If this is a correct picture the thing we call a boycott originally signified violence, if not murder. If the defendants in their hand-bills and circulars used the word in its original sense in its application to the Carrington Publishing Company, there can be no doubt of their criminal intent. We prefer however to believe that they used it in a modified sense. As an importation from a foreign country we may presume that they intended it in a milder sense—in a sense adapted to the laws, institutions and temper of our people. In that sense it may not have been criminal. But even here, if it means, as some high in the confidence of the trades-union assert, absolute ruin to the business of the person boycotted unless he yields, then it is criminal. Instances are not wanting in our own country where the boycott has

been attended with more or less violence; and it cannot be denied that the natural tendency is, especially when applied by the ignorant and vicious, to attempt to make it successful by force. It too often leads to serious disturbances of the peace and even murder. We are loth however to assume that these defendants intended any such consequences. Nevertheless it is a dangerous instrumentality to use; and if those instigating and resorting to it do not of their own accord take notice of its peril and voluntarily abandon its use, as we sincerely hope they will, the courts at no distant day will be called upon to recognize its dangerous tendency and treat it accordingly.

From these considerations it is apparent that the purpose of this conspiracy, or the means by which it was to be accomplished, or both, were not only unlawful, but, as some authorities express it, " were in some degree criminal."

We have carefully examined the evidence in this case and are of the opinion that it is sufficient to sustain the verdict. The only point which we regard as debatable is that relating to the purpose to demand money to pay the expenses of the boycott; but we think on the whole the jury were justified in finding that the parties concerned were given to understand that they would be required to pay the expenses. As the boycott never reached such a stage as that such a demand could with propriety be made, there is no direct evidence that there was any intention to make it, but there were abundant intimations that such a demand would be' made, and there can be little doubt that such a probability was distinctly presented as an inducement not to prolong the contest.

The declarations of one Kidd, who, as the evidence shows, was one of the conspirators, although not a defendant, were admitted in evidence against the objection of the defendants. The declarations were made during the continuance of the conspiracy, and for the purpose on the part of the conspirators, including Kidd, of carrying the same into full effect, and related to the way and manner by which the conspirators intended to accomplish their objects and pur-

poses. What Kidd said was in effect that he did not believe the Carrington Publishing Company would fight them as the News did; that they would do the same as they had in the News case, and appeal to the merchants to take their advertisements out, and appeal to the subscribers; and that they would not do as they had done in the News case, but if they had another battle they would have to pay the expenses of the boycott. These declarations were made to one Skinner, a workman in the Courier office. At some time previous to the declarations in question he had had an interview with Kidd and the defendant Glidden, at which they attempted to induce him to take part with the Union in the controversy with the Carrington Company—in other words to join the conspiracy. The declarations in question, following the efforts by Glidden and Kidd to win over Skinner, may well be regarded as supplementary to those efforts and designed to make them successful; and so were acts in the prosecution of the object of the conspiracy, and as such were admissible.

As one of the means to carry the conspiracy into effect the state claimed that Glidden distributed circulars like exhibit I; and to prove that he did so distribute them, after offering evidence to prove that Glidden had been active in attempting to induce the public not to patronize the Courier, offered one Blakeman as a witness, who testified that on the most frequented street in New Haven he one evening saw two persons passing, one of whom was Glidden and the other he did not know; that these two persons were walking up and down the street in company and close together, and that from between them copies of the circular were from time to time dropped on the sidewalk, but the witness was unable to say which of the two dropped them. The circular was as follows, in large letters: "A word to the wise is sufficient. Boycott the Journal and Courier." To the admission of this circular the defendants objected; the court admitted it. We think it was properly admitted. Upon that evidence the jury might well find that Glidden distributed the circulars.

A proposed agreement was submitted to the News during the progress of the boycott on that paper by these defendants, or some of them, who were active in that transaction. When offered in evidence it was objected to but admitted. It is now insisted that it ought not to have been received for the reason that it is not admissible to prove that the defendants committed a similar offense for the purpose of proving that they committed the offense charged. That proposition is conceded. But we do not understand that the evidence was offered or received for any such purpose. These defendants were active in boycotting the News. In this transaction they frequently referred to that; and proclaimed their purpose to pursue the same general policy, including a demand that the expenses should be paid. The effect of that was a threat; and was understood as such by the parties. Assuming, as we do, that the parties also understood in a general way the details of the News boycott, they must also have understood just what they were to expect. In order that the jury may appreciate the full force of the threat it is necessary to possess them as far as may be with the same knowledge. The better way to do that would seem to be to show what was done in that case. That disclosed the purposes and intention of the conspirators in the present case. By frequent reference to it as a precedent they made the details of that case to some extent at least relevant and material.

Exhibit L, which was a notice to the News that it would be charged $50 per week as its share of the expenses of the boycott, was admissible for the same reasons.

The state proved that the above mentioned paper was submitted to the News by one Fowler. During that interview the subject matter of the News paying the $500 was talked over between the committee and Fowler. It further appeared that Glidden and Mulcahy personally were not in favor of pressing the money demand, but the committee finally concluded to let it stand. On the cross-examination of Fowler his attention was called to another interview between him and Glidden, which took place subsequently,

and to which the state on the direct examination had not referred or alluded; and the witness was asked to state what Glidden at such different and subsequent interview said upon this subject of money demand from the News. This inquiry was objected to and excluded. That ruling was clearly correct.

One Mailhouse, one of the conspirators but not a defendant, was offered as a witness by the state, but declined to testify on the ground that his testimony would tend to criminate himself. The state then offered Judge Deming as a witness to prove what Mailhouse had sworn to on the trial of another case before the City Court. His testimony was received against the defendant's objection. The substance of the testimony was that he, Mailhouse, printed some circulars used by the defendants in this case during the existence of the claimed conspiracy, and while it was being carried on, and in furtherance thereof. This testimony was objected to, ruled in, and exception taken.

The import of the finding is, that this testimony was offered for the purpose of proving the fact that Mailhouse printed the circulars. The objection being general, perhaps it may fairly be inferred that it was on the ground that that fact was not relevant. If so, the objection is without foundation. It may have been on the ground that it was not competent to prove the fact by the admission of a conspirator who was not a party. But the record discloses no such ground of objection, and counsel for the defense do not allude to it in their brief. As that question has not been discussed we will not consider it. The only other reason for objecting to it seems to be that the testimony of Mailhouse before the City Court was not admissible as the declaration of a co-conspirator. That is the only question that has been discussed, and we must assume that it is the only one the defense intended to raise. Assuming that the defendants are right in this, still they are not entitled to a new trial, because, as we interpret the record, the testimony was not offered for the purpose of proving a mere declaration, but for the purpose of proving the fact that Mailhouse printed

the circulars. That is apparent from the fact that Mail-house himself was first offered as a witness. He would hardly have been offered for the purpose of proving his own declaration, as any other witness could have sworn to it just as well. He was manifestly offered to prove that he printed the circulars.

The state offered one Bertha Palm as a witness, who testified, against the general objection of the defendants, that she overheard a conversation between five or six print-ers, members of the union, among whom was the defendant Mulcahy, the others not identified, in which it was stated, but by whom she could not say, that they were paying fifty cents a week for the expenses of the Courier boycott, and that it would be paid for by the Courier. On objection by the defendants the court ruled that this evidence was admis-sible.

We are inclined to think that this ruling was correct. The boycott was inaugurated and prosecuted by Typograph-ical Union No. 47. Here were five or six of the members of that union, including Mulcahy, conversing on the subject of that boycott, and one of them remarked that they were paying money to support it, and that it would be paid for by the Courier. From the fact that these men were members of the union, in connection with the further fact that by the statement then and there made they were promoting the boycott by the payment of money, it is not going too far to assume that these men were parties to the conspiracy, and so their declarations were admissible, not only against Mulcahy, but against the other defendants as well. Mulcahy was a party to that conversation and presumptively he heard the remark. He made no reply and thereby assented to its truth. We think it tended to show that Mulcahy under-stood and intended that the Courier should be required to pay the expenses of the boycott.

There is no error and a new trial is denied.

In this opinion the other judges concurred.