## *In re* HIGGINS and others.[1]

### (*Circuit Court, N. D. Texas.* April, 1886.)

1. RAILROAD—RECEIVERS AND THEIR EMPLOYES.

   Receivers are sworn officers of the court, and their agents and employes in operating the railway are, *pro hac vice,* the officers of the court. As such officers, they are responsible to the court for their conduct; and, if they willfully injure the property or endanger it, or seek to cripple its operation in the hands of the receivers, they can and will be made to answer therefor. At the same time, these officers, and the property of the company in the custody of the court, are entitled to and must have the full protection that the court can give, under the laws of the land; and this, whether the grievance comes from within or without.

2. CONTEMPT OF COURT.

   It is well settled that whoever unlawfully interferes with property in the possession of a court is guilty of contempt of that court, and it is equally well settled that whoever unlawfully interferes with officers and agents of the court in the full and complete possession and management of property in the cus-

---

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

tody of the court is guilty of a contempt of court, and it is immaterial whether this unlawful interference comes in the way of actual violence, or by intimidation and threats.[1]

Proceedings for Contempt.

*Charles B. Pearre,* U. S. Atty., for the prosecution.

*Mr. Priest,* for defendants.

PARDEE, J. The Texas & Pacific Railway Company is an insolvent corporation. At the suit of creditors its property, railways, and rolling stock have been taken into the possession of the United States circuit court for the Eastern district of Louisiana, to be held and preserved for the payment of liens as they may be established. In order to hold and preserve the property and the franchises which make the property valuable it is necessary to operate the same, and the court has appointed receivers to operate and manage the several lines of railway forming the Texas & Pacific Railway line, running from New Orleans to El Paso.

The orders of the circuit court for the Eastern district of Louisiana have been entered in proper ancillary proceedings in each district through which the railway lines extend, and have been in each district ratified and confirmed and made the order of the United States circuit court for such district. This railway property is therefore lawfully in the hands of the United States courts in this circuit, and is entitled to and must have the protection of the court. The receivers are sworn officers of the court, and their agents and employes in operating the railway are, *pro hac vice,* the officers of the court. As such officers they are responsible to the court for their conduct, and if they willfully injure the property, or endanger it, or seek to cripple its operation in the hands of the receivers, they can and will be made to answer therefor. At the same time, these officers, and the property of the company in the custody of the court, are entitled to and must have the full protection that the court can give under the laws of the land; and this, whether the grievance comes from within or without. If any employe of the receivers has any grievance or complaint as to his employment or wages or treatment, he can bring the matter before the court, and the court will hear and arbitrate, and see justice done in the premises.

It is well-settled law that whoever unlawfully interferes with property in the possession of a court is guilty of contempt of that court, and I regard it as equally well settled that whoever unlawfully interferes with officers and agents of the court, in the full and complete possession and management of property in the custody of the court, is guilty of a contempt of court; and it is immaterial whether this unlawful interference comes in the way of actual violence, or by in-

---

[1] Respecting the interference by strikers with property in the hands of the courts, and their liability therefor in criminal contempt, see In re Doolittle, 23 Fed. Rep. 544, and note by Francis Wharton, 549-551.

timidation and threats. The employes of the receivers, although, *pro hac vice*, officers of the court, may quit their employment, as can employes of private parties or corporations, provided they do not thereby intentionally disable the property; but they must quit peaceably and decently. Where they combine and conspire to quit with or without notice, with the object and intent of crippling the property or its operation, I have no doubt that they thereby commit a contempt; and all those who combine and conspire with employes to thus quit, or, as officials of labor organizations, issue printed orders to quit, or to strike, with an intent to embarrass the court in administering the property, render themselves liable for contempt of court.

Labor organizations are lawful and generally laudable associations, but they have no legal *status* or authority, and stand before men and the law on no better footing than other social organizations, and it is preposterous that they should attempt to issue orders that free men are bound to obey; and no man can stand in a court of justice and shelter himself behind any such organization from the consequence of his own unlawful acts. It is a part of this case, and has been established by evidence taken under the direction of the court, that among all the employes of the receivers in operating over 1,500 miles of railway there was no complaint made to the receivers. or to the court, by any employe, of bad treatment or insufficient wages or other grievances; and yet orders were issued from a secret organization to all their employes to quit work, to strike, to cripple the operations of a great thoroughfare for travel and commerce; and many employes, confederating and combining, did quit, and induced and forced others to quit, and did hinder and delay the operation of the railway, and did damage the property in the possession of the court many thousand dollars. This action was a gross contempt of court, wholly unreasonable and unjustifiable. The court has learned through the newspapers, and from certain scandalous and anonymous circulars, that these wrongs were committed because the agents of the receivers had discharged as incompetent, and for absence without leave, a certain employe, and refused to reinstate him at the demand of a secret labor organization which claimed that this discharge was in violation of an agreement forced upon the managers of the road prior to the receivership. However this may be, I deem it proper to say that, if true, the reason is impertinent, and such demands cannot be tolerated.

The Texas & Pacific Railway property is in the hands of a recognized constitutional court of the United States, fully able and willing to enforce its lawful authority, and to protect its officers; and that court cannot listen to demands of any secret organization, whether alleged to be social, religious, political, or economical in character. If any employe was improperly discharged by the receivers or their agents, the court was open to hear him, and was willing to see justice done. No such complaint has been made, and I doubt much if such case exists; but the investigation made under

direction of this court, and the development of affairs since the strike was ordered, satisfy me that such alleged reason was a mere scheme and pretense, and that the real motive for the order to strike was to compel a recognition of a certain secret labor organization (which, by evidence, has been shown to be about as arbitrary and autocratic in dealing with labor as the famous six companies of China) as an existing power, so that its officers shall be consulted in the operation and management of railroads in which they do not own any interest, and of which they do not even pretend to be employes; and it is an indisputable fact that nine-tenths of the men obeying the order to strike were not aware of the alleged nor real reason which was at the bottom of the arbitrary order, which was to result in so much injury to them and damage to the public. These present cases show that peaceable trifling with the courts of the land was not sufficiently criminal in the eyes of many of the leaders of these misguided men, and they, with others, have undertaken to order that railway property in the hands of the United States courts should not be operated and managed at all unless with their consent, and upon their terms; and violence and intimidation and bulldozing have been resorted to to prevent the officers of the court from performing their duties. This intolerable conduct goes beyond criminal contempt of court, into the domain of felonious crimes; but, so far as the court has now to deal with it, it is a matter of criminal contempt of court.

It may not be generally known, but the power of the court, under the law, in punishing such cases, is unlimited in imposing fines or imprisonment. The extent of either is a matter wholly within the discretion of the judge. It is unnecessary to say that the court has no desire for mere punishment, and has no other interest in the matter than to vindicate the dignity of the court, protect the property in its charge, and that the judge shall fearlessly and honestly discharge the duties incumbent on him under the constitution and laws of the country. Considering the offenses, the sentences now imposed are light. They are, however, substantial warnings.

Memorandum of orders made and sentences imposed: Timothy Higgins, threatening and cursing employes, 15 days in Dallas jail. Richard Gordon, intimidating employes, and throwing rocks at them, severely injuring one Roberts, 90 days in Dallas jail. Perry Thompson, throwing rocks at cars, plea of guilty and imprisonment considered, discharged. Chas. Wilson, displacing switch and derailing engine, five months in Dallas jail. E. Bishop, Robt. Irwin, F. P. Lowe, F. R. Anderson, William Mace, taking forcible possession of switch and track, resisting officers and threatening employes: Bishop, three months in Dallas jail; F. P. Lowe, sentence postponed for further inquiry until May term, and released on bond of $1,000 for good behavior and appearance; Robert Irwin, discharged; William Mace and F. R. Anderson, sentence deferred, and released on personal recognizance. Samuel Barry, intimidating employes, etc., discharged. Charles Barton, intimidating and assaulting employes, 30 days in Dallas jail. Ed. Donahue, sentence postponed, released on bond of $1,000 to appear when notified. In the case of Gordon, Wilson, and Bishop, contempt of the orders of court was aggra-

vated by a criminal endangering of life as well as property, and Gordon and Wilson both exhibited in their conduct an assassin-like disposition and intent. Bishop's conduct, though unlawful, was bold and manly in comparison.