FARMERS' LOAN & TRUST CO. v. NORTHERN PAC. R. CO. et al.

(Circuit Court, E. D. Wisconsin. April 6, 1894.)

1. EQUITY JURISDICTION—CONSPIRACIES.
A court of equity having charge of a railroad through its receivers has authority to restrain the formation and execution of a conspiracy among the employes to quit the service in a body with the design and intent of crippling the property in their custody, or embarrassing the operation of the road.

2. CONSPIRACIES—ACT OF CONGRESS.
There is nothing in the act of congress entitled "An act to legalize the incorporation of National Trades Unions" (24 Stat. c. 567), to countenance the idea that it so changes the common law as to authorize combinations and conspiracies of interstate employes to quit the service in a body, with the design and intent of crippling the property in their custody, or embarrassing the operation of the road, with the ulterior purpose of enforcing a demand against the master.

3. SAME—DEFINITION OF STRIKE—INJUNCTION.
A strike is a combination among workmen to compel the master to the concession of a certain demand by preventing the conduct of his business until compliance with the demand. The concerted cessation of work is but one of and the least effective of the means to the end; the intimidation of others from engaging in the service, the interference with and the disabling and destruction of property, and resort to actual force and violence when necessary to the accomplishment of the end being the other and more effective means employed. Such a strike is unlawful, and a federal court having charge through its receivers of an interstate railroad had jurisdiction to enjoin the executive heads of the various organizations of railroad employes from ordering a strike upon the road.

This was a petition presented by Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse, who were appointed receivers of the property of the Northern Pacific Railroad, in a suit brought against that company and others by the Farmers' Loan & Trust Company, setting forth that their employés are contemplating a strike for the purpose of preventing a proposed reduction of wages, and praying that they be enjoined therefrom. There was also a supplemental petition representing that the threatened strike would be ordered by the executive heads of the various organizations of railway employés, and praying an injunction against them, their agents, and various other parties. Injunctions were accordingly

granted, and the case is now heard on motion of the officers of these organizations to modify the same by striking out certain portions specially objected to.

Charles Quarles, T. W. Spence, and T. W. Harper, for moving parties.

James McNaught, John C. Spooner, and Geo. P. Miller, for receivers.

JENKINS, Circuit Judge. On the 19th day of December, 1893, the receivers of the defendant company presented to the court their verified petition representing that on the 17th day of August, 1893, and within two days after their appointment, and in view of the insolvent condition of the railroad company, they ordered a reduction varying from 10 to 20 per cent. in the salaries of all employés (including the general manager and other general officers of the company) amounting to $1,200 per annum or more, which reduction was acquiesced in by the employés to whom the same applied. On the 25th of August, 1893, in view of the increasing depression in the transportation business, the consequent falling off of earnings, and the necessity of greater retrenchment in operating expenses, the receivers ordered a further reduction in salaries and wages of employés, amounting to 5 per cent. on all salaries aggregating $50 a month and under $75, and to 10 per cent. on all salaries aggregating from $75 to $100 per month. This latter order was to take effect immediately, but upon consideration its operation was suspended by the receivers until the entire subject of salaries and wages could be more fully considered, especially with reference to certain schedules covering the pay and employment of certain classes of employés. The receivers informed the court that some of these schedules, which had been in existence for many years, were not justified by conditions now existing; that they had been amended from time to time, and extended so that they had become voluminous, and in some respects obscure, and had produced in operation inequalities and results unjust to the property, and unjust to many employés; that they thereupon revised and rearranged the schedules, and, instead of putting into operation the reduction contemplated by the order of August 25th, they determined and ordered on the 28th of October, 1893 (giving general notice thereof to the employés of the road), that all existing schedules covering the rates of pay of employés should, on the 1st of January then next ensuing, be abrogated, and that certain new schedules prepared by them should take effect on that day; and the general manager was instructed on and after that day to reduce all salaries and wages aggregating $50 per month and less than $75 per month 5 per cent., and all salaries and wages aggregating $75 per month 10 per cent. The revised schedules corrected supposed inequalities between the different classes of employés, and did away with certain obnoxious regulations which were supposed to militate against the proper management of the property. The receivers further rep-

resented to the court that the reduction made in salaries and wages was justified in view of the large shrinkage of business, growing out of the financial revulsion throughout the country; that the rates of compensation provided for were fair and just to the employés to whom they related, in view of the then present conditions. It was made to appear to the court that the gross earnings of the property during the year 1893 were continuing to greatly decrease; that the decrease for the month of September, 1893, as compared with the month of September, 1892, amounted to $753,000; that the decrease for the month of December, 1893, as compared with the month of December, 1892, would amount to $730,000, decreasing by more than one-half the entire estimated gross earnings for the month. That by the revised schedules the average reduction in the rates of compensation to the various classes of employés was about as follows: Engineers, 8 per cent.; firemen, 7 per cent.; trainmen and freight conductors, 8 per cent.; passenger conductors, 10 per cent.; telegraphers, 5 per cent. The receivers further advised the court that many of their employés claimed that the schedules and rates in force when the receivers took possession constituted contracts between the several employés and the receivers, terminable only by the consent of the employés, in which view the receivers could not concur; and that discontent and opposition to the enforcement of the schedule were rife among the employés, based upon the assumption that no power existed in the receivers to change the schedule. The receivers further advised the court that some of the employés threatened that, in the event that the revised schedules should be put into operation, they would suddenly quit the service of the receivers, and would compel by threats and force and violence other employés to quit the service; that they would prevent, by an organized effort, and by force and intimidation, others from taking service under the receivers in the place of those who might leave such service; and that they would thereby, as the means of forcing the receivers to abandon the proposed revised schedules, disable the receivers from operating the road, and from discharging their duty to the public as common carrier. The receivers further represented to the court that some of the employés threatened, if the revised schedules should be put in operation, to disable locomotives and cars so that the same could not be safely used at all without expensive repairs; that they would take possession of the cars, engines, shops, roadbed, and other property in possession of the receivers, and that they would destroy and prevent the use of the property, and would so conduct themselves with regard thereto as to hinder and embarrass the receivers in the management of the property, in the operation of the trains thereover, and would bring about incalculable loss to the trust property, and inflict great inconvenience and hardship upon the public. The receivers further represented to the court that, unless the parties were restrained and prohibited by order of the court, they would carry out such threats, and the receivers would be prevented from operating the road, from carrying the mails

of the United States thereover, from performing the duties of a common carrier thereon, and that great loss of property and jeopardy to life would ensue; that the parties referred to (whose names the receivers were unable to state) were contriving secretly to perpetrate the acts of violence and wrong described, and to interfere with the possession and operation by the court, through the receivers, of the property; that such combination included not only dissatisfied employés of the receivers, but others not. in the service of the receivers, who, from a spirit of sympathy or mischief, threaten to join the employés in perpetrating the wrongful acts and things stated; and that they would so do unless restrained by the court. The receivers thereupon asked, among other things, for an order authorizing them to put in operation and maintain on and after January 1st, then proximo, the revised schedules in such petition described, and that a writ of injunction might issue as prayed for in the petition.

Upon consideration of the petition the court on that day entered its order authorizing the receivers to adopt the revised schedules, and directing the issue of a writ of injunction as prayed for in the petition, and directing its delivery to the marshal for execution, ordering him to protect the receivers of the Northern Pacific Railroad in their possession of the property of the railroad, and in their operation thereof; and directing the receivers to file, in the courts wherein they had been appointed receivers of said property upon ancillary bills, petitions similar to that on which the order was based, to the end that the power of each court might be seasonably invoked for the protection of the receivers in the possession and management of the property within its territorial jurisdiction. The writ in question was directed to the officers, agents, and employés of the receivers, engineers, firemen, trainmen, train dispatchers, telegraphers, conductors, switchmen, and all other employés of the receivers, and to all persons, associations, and combinations, voluntary or otherwise, whether employés of said receivers or not, and to all persons generally. The restraining clause of the writ is as follows:

"Now, therefore, in consideration thereof, and of the matters in said petition set forth, you, the officers, agents, and employés of Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse, as receivers of the Northern Pacific Railroad Company, and the engineers, firemen, trainmen, train dispatchers, telegraphers, conductors, switchmen, and all other employés of said Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse, as receivers of the Northern Pacific Railroad Company, and each and every one of you, and all persons, associations, and combinations, voluntary or otherwise, whether employés of said receivers or not, and all persons generally, and each and every one of you, in the penalty which may ensue, are hereby charged and commanded that you, and each and every one of you, do absolutely desist and refrain from disabling or rendering in any wise unfit for convenient and immediate use any engines, cars, or other property of Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse, as receivers for the Northern Pacific Railroad Company, and from interfering in any manner with the possession of locomotives, cars, or property of the said receivers, or in their custody, and from interfering in any manner, by force, threats, or otherwise, with men who desire to continue in the service of the said receivers, and from interfering in any manner, by force, threat, or otherwise, with men employed by the said

receivers to take the place of those who quit the service of said receivers, or from interfering with or obstructing in any wise the operation of the railroad, or any portion thereof, or the running of engines and trains thereon and thereover, as usual, and from any interference with the telegraph lines of said receivers or along the lines of railways operated by said receivers, or the operation thereof, and *from combining and conspiring to quit, with or without notice, the service of said receivers, with the object and intent of crippling the property in their custody, or embarrassing the operation of said railroad, and from so quitting the service of the said receivers, with or without notice, as to cripple the property, or to prevent or hinder the operation of said railroad,* and generally from interfering with the officers and agents of said receivers, or their employés, in any manner, by actual violence, or by intimidation, threats, or otherwise, in the full and complete possession and management of the said railroad, and of all the property thereunto pertaining, and from interfering with any and all property in the custody of the said receivers, whether belonging to the receivers or shippers or other owners, and from interfering, intimidating, or otherwise injuring or inconveniencing or delaying the passengers being transported or about to be transported over the railway of said receivers, or any portion thereof, by said receivers, or by interfering in any manner by actual violence or threat, and otherwise preventing or endeavoring to prevent the shipment of freight or the transportation of the mails of the United States over the road operated by said receivers, until the further order of this court."

On the 22d day of December, 1893, the receivers presented to the court their supplemental petition, setting forth that the employés affected by the new schedules referred to in the former petition, consisted of engineers, conductors, firemen, trainmen, switchmen, operators, and shopmen; that each of said classes of employés had appointed a committee to confer with the operating officers of the receivers, at St. Paul, with reference to the proposed change in the schedules, and stating the names of the members of those several committees; that such committees had confederated and agreed to co-operate and report to the various classes of employés along the line whom such committee especially represented a joint recommendation,—that is to say, should said committees agree to report and recommend a strike along the line of the railroad, then the separate committees mentioned representing the different classes of employés along the line should report and recommend separately to the employés represented by such committee to strike. The petition further represented to the court that a subcommittee of 32 persons had been appointed by the joint committee to confer with the operating officers of the receivers, and to make report and recommendation to the joint committee; and that, should such subcommittee recommend a strike, the general and joint committee would report or recommend a strike, which the separate committees in turn would recommend or report to the different orders or classes of labor to which they belonged upon the lines of the railroad. The receivers further represented that the subcommittee of said general committee intended and was about to recommend and advise the general joint committee to recommend that the employés of the road should strike on or about January 1, 1894, and that the general joint committee and the said several separate committees were about to recommend to the several classes of labor in the employment of the receivers to strike on or about that day. And the receivers further informed the court that, if such committees should recommend

a strike, the individual employés along the line of the road would on the day recommended join in a general strike, unless the members of the committee were enjoined by the court from issuing any order or recommendation to strike; that the employés of the railroad held themselves bound to obey the order or recommendation of the committee; that almost all of the employés of the road belonged to one of the labor organizations of the engineers, conductors, firemen, trainmen, switchmen, operators, or shopmen, and also to national labor organizations comprising the employés in similar lines on almost all the other lines of railroad in the United States, namely, the Brotherhood of Locomotive Engineers, the Order of Railway Conductors, the Brotherhood of Locomotive Firemen, the Order of Railway Telegraphers, and the Brotherhood of Railway Trainmen. The petition then proceeds to give the names of the executive heads of those organizations, and asserts that the employés will not strike unless such strike is ordered by one or more of the executive heads of the national labor organizations named; and that, without an order from the executive head, no assistance would be given to the employés by the national organizations to which they belonged if they should attempt to strike. The petition further alleged that the railway in question was engaged in interstate commerce, and that a strike along the line of the road would not only cause irreparable damage to the trust property, but to a large portion of the country traversed by the Northern Pacific Railroad, because not reached by any other line of road or telegraph line or express company. That there were many communities along the line of the railroad whose entire commercial facilities were furnished by the three departments of the railroad operated by the receivers,—the railroad, the telegraph, and the express; and that all classes of business men in large portions of the country traversed by the railroad operated by the receivers were dependent, to a very large extent, upon these three departments of service, and that large sections of country are dependent upon the railroad trains operated by the receivers for their necessary daily supply of fuel, provisions, etc. The petition asked for an order granting a writ of injunction restraining these committees and the heads of the national organizations mentioned from ordering or recommending or advising a strike.

Upon consideration of this petition an order was made directing a writ of injunction to issue as prayed in the original petition, and as prayed in the supplemental petition, with a similar direction with respect to the presentation of the order and writ to those courts in which ancillary bills had been filed for like orders from those courts. The writ of injunction issued upon this order was directed to the various persons named, and to their agents, subagents, representatives, and employés, and to the officers, agents, and employés of the receivers, and to the engineers, firemen, trainmen, train dispatchers, telegraphers, conductors, switchmen, and all other employés of the receivers, and to all persons, associations, and combinations, voluntary or otherwise, whether employés of said receivers or not, and to all persons generally. It embodied the provisions of the first writ, with the following additional clause:

*" And from combining or conspiring together or with others, either jointly or severally, or as committees, or as officers of any so-called 'labor organization,' with the design or purpose of causing a strike upon the lines of railroad operated by said receivers, and from ordering, recommending, approving, or advising others to quit the service of the receivers of the Northern Pacific Railroad Company on January 1, 1894, or at any other time; and from ordering, recommending, advising, or approving by communication or instruction or otherwise, the employes of said receivers, or any of them, or of said Northern Pacific Railroad Company, to join in a strike on said January 1, 1894, or at any other time, and from ordering, recommending, or advising any committee or committees, or class or classes of employes of said receivers to strike or join in a strike on January 1, 1894, or at any other time, until the further order o 'his court."*

On the 15th day of February, 1894, P. M. Ar... ..r, grand chief engineer and chief executive officer of the Brotherhood of Locomotive Engineers; E. E. Clark, grand chief conductor and chief executive officer of the Order of Railway Conductors; F. P. Sargent, grand chief fireman and chief executive officer of the Brotherhood of Locomotive Firemen; D. G. Ramsey, grand chief telegrapher and chief executive officer of the Order of Railway Telegraphers; S. E. Wilkinson, grand master and chief executive officer of the Brotherhood of Railway Trainmen; and John Wilson, grand master and chief executive officer of the Switchmen's Mutual Aid Association,—in behalf of themselves and of their respective organizations and associations, and the members thereof, and in behalf of such of the employès of the receivers as are members of the said associations and organizations, moved the court to modify the writs of injunction by expunging and striking from the writs the parts italicized. The motion was based upon the petition and supplemental petition, and upon the orders of the court directing the issuance of the writs; and at the hearing the constitutions, statutes, and rules of order of the various organizations referred to were presented and considered in argument.

In the discussion of the important and interesting questions presented by this motion it is not within the province of the court to assume part in the contest between capital and labor, which it is asserted is here involved. It may be that the aggregated power of combined capital is fraught with danger to the republic. It may be that the aggregated power of combined labor is perilous to the peace of society, and to the rights of property. It doubtless is true that in the contest the rights of both have been invaded, and that each has wrongs to be redressed. If danger to the state exists from the combination of either capital or labor, requiring additional restraint or modification of existing laws, it is within the peculiar province of the legislature to determine the necessary remedy, and to declare the general policy of the state touching the relations between capital and labor. With that the judicial power of the government is not concerned. But it is the duty of the courts to restrain those warring factions, so far as their action may infringe the declared law of the land, that society may not be disrupted, or its peace invaded, and that individual and corporate rights may not be infringed. It therefore becomes the duty of the court to inquire whether, in respect of the things complained of, there has been threatened violation of the law of the land, and to determine the appropriate remedy, taking care, however, to apply

the remedy without usurpation of jurisdiction, or, as remarked by Lord Chancellor Bacon, "to contain jurisdiction within the ancient mere-stones without removing the mark;" and having also constantly in mind the maxim that the province of the court is "dicere et non dare legem." In this spirit, as I trust, I proceed to the consideration of the questions involved, taking occasion to express my obligation to counsel, whose able presentation of the law has much relieved the labor of the court, if it could not lighten its responsibility.

If the combination and conspiracy alleged, and the acts threatened to be done in pursuance thereof, are unlawful, it cannot, I think, be successfully denied that restraint by injunction is the appropriate remedy. It may be true that a right of action at law would arise upon consummation of the threatened injury, but manifestly such remedy would be inadequate. The threatened interference with the operations of the railway, if carried into effect, would result in paralysis of its business, stopping the commerce ebbing and flowing through seven states of the Union, working incalculable injury to the property, and causing great public privation. Pecuniary compensation would be wholly inadequate. The injury would be irreparable. Compensation could be obtained only through a multiplicity of suits against 12,000 men, scattered along the line of this railway for a distance of 4,400 miles. It is the peculiar function of equity in such case, where the injury would result not alone in severe private, but in great public, wrong, to restrain the commission of the threatened acts, and not to send a party to seek uncertain and inadequate remedy at law. That jurisdiction rests upon settled and unassailable ground. It is not longer open to controversy that a court of equity may restrain threatened trespass involving the immediate or ultimate destruction of property, working irreparable injury, and for which there would be no adequate compensation at law. It will, in extreme cases, where the peril is imminent, and the danger great, issue mandatory injunctions requiring a particular service to be performed, or a particular direction to be given, or a particular order to be revoked, in prevention of a threatened trespass upon property or upon public rights. I need not enlarge upon this subject. The jurisdiction is beyond question, is plenary and comprehensive. Some of the authorities are assembled by Judge Taft in the case of Toledo, etc., R. Co. v. Pennsylvania Co., 54 Fed. 730,— a case in which the court restrained Mr. Arthur, chief of the Brotherhood of Locomotive Engineers, from giving the order and signal for a strike which was intended to result in injury to the complainant's rights. See, also, Blindell v. Hagan, 54 Fed. 40, affirmed on appeal 6 C. C. A. 86, 56 Fed. 696; Coeur d'Alene Consolidated & Min. Co. v. Miners' Union, 51 Fed. 260. It would be anomalous, indeed, if the court, holding this property in possession in trust, could not protect it from injury, and could not restrain interference which would render abortive all efforts to perform the public duties charged upon this railway.

It was suggested by counsel that, as improper interference with this property during its possession by the court is a contempt, punishment therefor would furnish ample remedy; and that, therefore, an injunction would not lie. This is clearly an erroneous view. Punishment for contempt is not compensation for injury. The pecuniary penalty for contumacy does not go to the owner of the property injured. Such contempt is deemed a public wrong, and the fine inures to the government. The injunction goes in prevention of wrong to property and injury to the public welfare; the fine, in punishment of contumacy. The authority to issue the writ is not impaired by the fact that, independently of the writ, punishment could be visited upon the wrongdoer for interference with property in the possession of the court. The writ reaches the inchoate conspiracy to injure, and prevents the contemplated wrong. The proceeding in contempt is ex post facto, punishing for a wrong effected.

Asserting, then, as undoubted, the right of the court by its writ to restrain unlawful interference with the operation of this railway, I turn my attention to the objections urged to particular paragraphs of the writs. It is contended that the restraint imposed by that part of the original writ to which objection is made by this motion is in derogation of common right, and an unlawful restraint upon the individual to work for whomsoever he may choose, to determine the conditions upon which he will labor, and to abandon such employment whenever he may desire. In the determination of this question it is needful to look to the conditions which gave rise to the issuance of the writ. Here was a railway some 4,400 miles in length, traversing some seven states of the Union, engaged in interstate commerce, carrying the mails of the United States. This vast property was within the custody of the court, through its receivers, in trust to operate it, to discharge the public duties imposed upon it, to keep it a going concern until the time should come to hand it over to its rightful owners with all public duties discharged, and with its franchise rights and privileges unimpaired. The receivers employed in the operation of this property some 12,000 men. These men are, pro hac vice, officers of the court, and responsible to the court for their conduct. In re Higgins, 27 Fed. 443. The petition represented to the court—and the facts are confessed by this motion—that some of the men threatened to suddenly quit the service of the receivers, and to compel, by threats and force and violence, other employés, who were willing to continue in the service, to quit their employment; that by organized effort, and by force and intimidation, they would prevent others from taking service under the receivers in place of those who might leave such service, and would thereby, as a means of forcing the receivers to submit to the terms demanded, disable the receivers from operating the road and discharging their duty to the public as a common carrier, and would so conduct themselves by disabling locomotives and cars, and taking possession of the property of the receivers, as to destroy and prevent its use, and hinder and embarrass the receivers in its management, thereby causing incalculable

loss to the trust property, and inflicting great inconvenience and hardship upon the public. The restraining portion of the writ complained of, and now under consideration, prohibited these men from combining and conspiring to quit this service with the object and intent of crippling the property of the receivers and embarrassing the operation of the road, and from carrying that conspiracy into effect. The writ was in prevention of the mischief asserted. In no respect, as I conceive, does that portion of the writ interfere with individual liberty. None will dispute the general proposition of the right of every one to choose his employer, and to determine the times and conditions of service, or his right to abandon such service,—to use the expression of Judge Pardee in Re Higgins, supra,—"peaceably and decently." But it does not follow that one has the absolute right to abandon a service which he has undertaken, without regard to time and conditions. It is absurd to say that one may do as he will without respect to the rights of others. It is not infringement upon individual liberty to compel recognition of the rights of others. Liberty and license must not be confounded. Liberty is not the exercise of unbridled will, but consists in freedom of action, having due regard to the rights of others. There would seem to exist in some minds a lamentable misapprehension of the terms "liberty" and "right." It would seem by some to be supposed that in this land one has the constitutional right to do as one may please, and that any restraint upon the will is an infringement upon freedom of action. Rights are not absolute, but are relative. Rights grow out of duty, and are limited by duty. One has not the right arbitrarily to quit service without regard to the necessities of that service. His right of abandonment is limited by the assumption of that service, and the conditions and exigencies attaching thereto. It would be monstrous if a surgeon, upon demand and refusal of larger compensation, could lawfully abandon an operation partially performed, leaving his knife in the bleeding body of his patient. It would be monstrous if a body of surgeons, in aid of such demand, could lawfully combine and conspire to withhold their services. It was stated at the argument that this was not a fair illustration of the proposition, because human life was involved. I cannot perceive that the aptness of the illustration is weakened because of that fact. Whether the effect be the destruction of life or the destruction of property, the principle is the same. It would be intolerable if counsel were permitted to demand larger compensation, and to enforce his demand by immediate abandonment of his duty in the midst of a trial. It would be monstrous if the bar of a court could combine and conspire in aid of such extortion by one of its members, and refuse their service. I take it that in such case, if the judge of the court had proper appreciation of the duties and functions of his office, that court, for a time, would be without a bar, and the jail would be filled with lawyers. It cannot be conceded that an individual has the legal right to abandon service whenever he may please. His right to leave is dependent upon duty, and his duty is dictated and measured by the exigency of the occasion. Ordinarily, the abandonment of service

by an individual is accompanied with so little of inconvenience, and with such slight resulting loss, that it is a matter of but little moment when or how he may quit the service. But, for all that, the principle remains, recognized by every just mind, that the quitting must be timely and decent, in view of existing conditions; and this, I take it, was Judge Pardee's meaning by the expression, "peaceably and decently." He had occasion only to deal with the particular facts he was considering, but the principle asserted is universal in its application. If what I have stated be correct as to individual action, the principle applies with greater force to the case of a combination of a large number of employés to abandon service suddenly, and without reasonable notice, with the result of crippling the operation of the railway and injuring the public. The effect in this particular instance would have proven disastrous. These labor organizations are said to represent three-fourths of all the employés upon the railways within the United States,—an army of many hundred thousands of men. The skilled labor necessary to the safe operation of a railway could not be readily supplied along 4,000 miles of railway. The difficulty of obtaining substitutes in the place of those who should leave the service would be intensified by the fact, asserted and conceded at the argument, that no member of these large organizations would dare to accept service in the place of those who should leave, because such acceptance would be followed by expulsion from their order, and by social ostracism by their fellows. If this conspiracy had proven effective by failure on the part of the court to issue its preventive writ, this vast property would have been paralyzed in its operation, the wheels of an active commerce would have ceased to revolve, many portions of seven states would have been shut off in the midst of winter from necessary supply of clothing, food, and fuel, the mails of the United States would have been stopped, and the general business of seven states, and the commerce of the whole country passing over this railway, would have been suspended for an indefinite time. All these hardships and inconveniences, it is said, must be submitted to, that certain of these men, discontented with the conditions of their service, may combine and conspire, with the object and intent of crippling the property, to suddenly cease the performance of their duties. It is said that to restrain them from so doing is abridgment of liberty and infringement of constitutional right. I do not so apprehend the law. I freely concede the right of the individual to abandon service at a proper time, and in a decent manner. I concede the right of all the employés of this road, acting in concert, to abandon their service at a proper time, and in a decent manner; but I do not concede their right to abandon such service suddenly, and without reasonable notice.

The railway is a great public highway. Its primary duty is to the public. In the interest of the public it must be kept a going concern, although it prove unremunerative to the shareholders. Bondholders and shareholders invest their money in view of the public nature of the enterprise. Their rights and interests are subordinated to the public duty charged upon the road,

And so, also, employés, in entering the service, assume obligations coextensive in kind with that of the corporation. They may, in: deed, sever their relation in a proper and decent manner, but they may not legally resort to obstructive methods to compass their demands. Their rights—as the rights of bondholder and shareholder—are subordinate to the rights of the public, and must yield to the public welfare. This public consideration permeates and controls the whole subject. The reason is forcibly stated by Judge Ricks in the case of Toledo, etc., R. Co. v. Pennsylvania Co., 54 Fed. 746, 752, holding that the duties of an employé of a public corporation are such that he cannot always choose his own time for quitting the service, in the following language:

"Holding to that employer so engaged in this great public undertaking the relation they did, they owed to him and to the public a higher duty than though their service had been due to a private person. They entered its service with full knowledge of the exacting duties it owed to the public. They knew if it failed to comply with the law in any respect, severe penalties and losses would follow for such neglect. An implied obligation was therefore assumed by the employés upon accepting service from it under such conditions that they would perform their duties in such manner as to enable it not only to discharge its obligations faithfully, but also to protect it against irreparable losses and injuries and excessive damages by any acts or omissions on their part. One of these implied conditions on their behalf was that they would not leave its service, or refuse to perform their duties, under circumstances when such neglect on their part would imperil lives committed to its care, or the destruction of property involving irreparable loss or injury, or visit upon it severe penalties. In ordinary conditions, as between employer and employé, the privilege of the latter to quit the former's service at his option cannot be prevented by restraint or force. The remedy for breach of contract may follow to the employer, but the employé has it in his power to arbitrarily terminate the relations, and abide the consequences. But these relative rights and powers may become quite different in the case of the employés of a great public corporation, charged ·by the law with certain great trusts and duties to the public. An engineer and fireman who start from Toledo with a train of cars filled with passengers destined for Cleveland, begin that journey under contract to drive their engine and draw the cars to the destination agreed upon. Will it be claimed that this engineer and fireman could quit their employment when the train is part way on its route, and abandon it at some point where the lives of the passengers would be imperiled, and the safety of the property jeopardized? The simple statement of the proposition carries its own condemnation with it. The very nature of their service, involving as it does the custody of human life and the safety of millions of property, imposes upon them obligations and duties commensurate with the character of the trusts committed to them."

In the case under consideration the receivers sought to change the terms and conditions of service. The employés had, of course, the right to decline service upon the terms proposed. Notwithstanding the public character of the service, upon notification of their declination at a time prior to January 1, 1894, reasonable in view of the service in which they were engaged, they had the undoubted right to abandon their employment upon that day. That, however, is not the case presented to and dealt with by the court. Nor does the rectitude of the writ of injunction rest upon any mere right of the employés in good faith to abandon their employment. The restraint imposed was with reference to

combining and conspiring to abandon the service with the object and intent of crippling the property. Its office was to restrain the carrying into effect of the conspiracy.

Was such a conspiracy unlawful? So long ago as 1821 Judge Gibson,—that judge "of great and enduring reputation,"—in the case of Com. v. Carlisle, Brightley, N. P. 36 (the case of a combination of employers to depress the wages of journeymen by artificial means), declared that "a combination is criminal when the act to be done has a necessary tendency to prejudice the public or to oppress individuals by unjustly subjecting them to the power of the confederates." He clearly asserts the principle upon which combinations of men may become unlawful as follows:

"It will therefore be perceived that the motive for combining, or, what is the same thing, the nature of the object to be attained as a consequence of the lawful act, is, in this class of cases, the discriminating circumstance. Where the act is lawful for an individual, it can be the subject of a conspiracy when done in concert only where there is a direct intention that injury shall result from it, or where the object is to benefit the conspirators to the prejudice of the public or the oppression of individuals, and where such prejudice or oppression is the natural and necessary consequence."

The doctrine thus declared is fully established. State v. Buchanan, 5 Har. & J. 317; State v. DeWitt, 2 Hill (S. C.) 282; State v. Norton, 23 N. J. Law, 33; State v. Donaldson, 32 N. J. Law, 151; State v. Burnham, 15 N. H. 396; State v. Glidden, 55 Conn. 46, 8 Atl. 890; Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307; Smith v. People, 25 Ill. 17; State v. Stewart, 59 Vt. 273, 9 Atl. 559; In re Higgins, 27 Fed. 443; Coeur d'Alene Consolidated & Min. Co. v. Miners' Union, 51 Fed. 260; U. S. v. Workingmen's Amalgamated Council, 54 Fed. 994. The reason is that the confederacy of numbers to effect an injurious object creates new and additional power to injure, and congregated numbers supply in law the place of actual violence. State v. Simpson, 1 Dev. 504. And therefore, in conspiracy, the unlawful thing proposed, whether as a means or an end, need not be such as would be indictable if proposed to be done by an individual. 2 Bish. Cr. Law (7th Ed.) § 181. I think the conclusion well summed up by Mr. Wright in his work on "The Law of Criminal Conspiracies," that a combination of men by concerted action, to accomplish some object not criminal, by means which are not criminal, but where mischief to the public is involved; or where neither the object nor the means are criminal, but where injury and oppression are the result,—is a conspiracy condemned by law. That this is the general law of the land, is recognized in those states which, by statute in respect to labor organizations, have changed the general rule. Thus the state of New Jersey passed a statute to this effect:

"It shall not be unlawful for any two or more persons to unite, combine, or bind themselves by oath, covenant, agreement, alliance or otherwise, to persuade, advise or encourage by peaceable means any person or persons to enter into any combination for or against leaving or entering into the employment of any person or persons or corporations."

The supreme court of that state, in the case of Mayer v. Association, 47 N. J. Eq. 519, 531, 20 Atl. 492, declared that by that stat-

ute "the policy of the law with respect to such combinations was revolutionized, and what before that time would have been held to have been an unlawful combination and conspiracy, became in this state a lawful association, and acts which had been the subject of indictment became inoffensive to any provision of our law." And to the same effect is the case of Com. v. Sheriff, 15 Phila. 393, under the statute of Pennsylvania of June 14, 1872, and the supplemental act of April 20, 1876.

It becomes necessary, then, to consider whether there is any statute, national or state, applicable to the railway in question, which can be deemed to be a modification of the general law of the land. It was asserted at the argument with great confidence that the act of congress entitled "An act to legalize incorporation of national trades' unions" (24 Stat. c. 567) had entirely changed the common law. I think the confidence of counsel in the assertion of the proposition was born of zeal, not of judgment. The statute provides for the formation of national trades' unions, with power to establish constitution, rules, and by-laws to carry out its lawful objects, and defines the term "national trades' union" to be "any association of working people having two or more branches in the states or territories of the United States for the purpose of aiding its members to become more skillful and efficient workers, the promotion of their general intelligence, the elevation of their character, the regulation of their wages, and their hours and conditions of labor, the protection of their individual rights in the prosecution of their trade or trades, the raising of funds for the benefit of the sick, disabled or unemployed members, or the families of deceased members, or for such other object or objects for which workingmen may lawfully combine, having in view their mutual protection or benefit." The most that can be claimed for this statute is that it removes the common-law disability of combination to raise the price of labor, and to establish the conditions of labor. It contains no suggestion of any right to combine or conspire with a view to injure or oppress or interfere with the rights of others. The organization of labor for the purpose specified in the statute is lawful and commendable, but the statute does not sanction the use of a lawful organization for an unlawful purpose. Nor does it permit such organization to invade the rights of others. Under this act, labor may organize to regulate wages, the hours of labor, and the conditions of labor, and for the protection of individual rights in the prosecution of labor; but such lawful organization cannot be employed to injure property, or for the oppression of others, or to harm the public welfare. There is nothing in the statute which sanctions that which the law, as above declared, condemns.

The statutes of Wisconsin (Sanb. & B. Rev. St. § 4466a) render it unlawful for "two or more persons to combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his reputation, trade, business or profession, by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." By

section 4466c it is rendered unlawful for any person, by threats, intimidation, force, or coercion of any kind, to hinder or prevent any other person from engaging in or continuing in any lawful work or employment, either for himself or as wage worker, or to attempt to so hinder or prevent. By section 4466d a punishment is provided for any one who, individually or in association with others, shall willfully injure or interfere with or prevent the running or operation or shall destroy any locomotive engine or cars or machinery. These statutes are declaratory of the common law, and wholly condemn all conspiracies to injure or oppress, or to interfere with the rights of others. Their efficacy is in no degree impaired by any statutory recognition of the right of organization for the purpose of promoting the welfare of labor. I have been referred to no statute in any state traversed by the Northern Pacific Railroad, and have been able to find none, which in any way changes the law in this regard. I think no state has gone so far in modification of the general rule as have the states of New Jersey and Pennsylvania. But there, as elsewhere, all labor organizations must be for lawful objects, to be accomplished by lawful means. If the ostensible purpose be legal, and the means for its accomplishment legal, still, if the real and secret purpose be illegal,—as for example, that purpose be of extortion or of injury to another,—the wrong cannot be shielded under the guise of a lawful organization. And where the object is to be accomplished by violence, intimidation, and the destruction of property, by coercion and by injury to the public, the organization, although formed for an ostensible legal object, is diverted to illegal purposes, and is to that extent unlawful.

Applying the principles of law, as I thus find them established, to the case in hand as presented by the original petition for the writ, it is clear that the facts charged presented to the court the case of an unlawful conspiracy. If it be conceded that the entire force of 12,000 men employed upon this railway had the legal right to abandon the service in a body, that right must be asserted and exercised in good faith. The abandonment of service must be actual, not pretentious. The combination cannot be justified on the plea of the lawful exercise of a right when the threatened abandonment of service is a mere pretext, the real intent and design being to cripple the property, and to hinder and prevent the operation of the road; and such was the conspiracy declared to the court,—not denied, but confessed, by the present motion. It was a conspiracy to compel by intimidation the receivers of the railway against their will to accede to the demands of the conspirators, and, therein failing, to cripple this property, and prevent the operation of the road, the necessary result of which would be to inflict great loss upon the public. The conspiracy disclosed was a conspiracy to extort, and, failing to extort, to injure; the pretentious exercise of the right to abandon service being one of the means to effect the object of the conspiracy. If the right to quit service in a body be conceded, the case presented is the ostensible exercise of a lawful right, not in good faith, but for an unlawful purpose, to wit, the

intimidation and oppression of others, and the injury to property in their keeping, tending to the prejudice of the public. Such a conspiracy is unlawful. It may also be properly said that the conspiracy was as needless as its results would have been disastrous. This vast property was in the custody of the court, through its receivers. By the schedules which for some years had been in force in the operation of this road, as well as by the new schedules proposed to be adopted by the receivers, a thorough civil service had been established in the management of this railway, recognizing by systematic promotion length of service and skillful and honest performance of labor. The service contemplated was continuous and permanent. No man could be discharged except for cause, of which he was to be informed. The right of a hearing upon such charge was secured to him, with right of successive appeals to the superior officers of the road. The employé, however, had the right to abandon his employment at any time. Thus capital and labor co-operated to assure employment, the reward of skill and faithfulness, and protection from discharge from service, except for justifiable cause. This operated to render the service efficient, conserving the interests of both capital and labor, and advancing the public welfare. It was natural, and to be expected, that in consequence of financial disaster there would arise the question of the reduction of wages. An employé, deeming himself wronged by the action of the receivers in respect thereto, had peaceful remedy. The court was at all times open to him to listen to his complaint, and to redress it, if it should appear to be well-founded. Upon such application the receivers would be bound to obey the order of the court in the premises. The employé, nevertheless, not content with the judgment of the court, would have the right to abandon his employment. The case furnishes, as was suggested by counsel, an exceptional instance, where one party to a proceeding in a judicial tribunal is bound by the decision and the other is not. There was, therefore, neither justification nor excuse for a conspiracy to hinder and prevent the operation of this railway, nor necessity for combination for the assertion of any legal right. But, if there were no remedy for the employé except abandonment of service, the law will not sanction a conspiracy, the purpose of which is to extort from the receivers or from the court concessions which they could not properly yield, and, failing to procure them, to hinder and prevent, by the means declared, the operation of this railway, to the injury of the trust, and to the oppression of the public. Such was the combination and conspiracy here disclosed. It was to the prevention of the injury thus contemplated that this writ was directed. Its issuance, in my judgment, is justified by the law.

The second branch of the motion has reference to the writ of injunction issued upon the supplemental petition of the receivers, restraining any combination or conspiracy having for its purpose the inauguration of a strike upon the lines of the railway operated by the receivers, and from ordering, advising, or approving, by communication or instruction or otherwise, the employés of

the receivers to join in a strike. This part of the motion presents the issue whether a strike is lawful. The answer must largely depend upon the proper definition of the term. It has been variously defined. By Worcester, "To cease from work in order to extort higher wages as workmen;" by Webster, "To quit work in a body, or by combination in order to compel their employers to raise their wages;" the Encyclopedic Dictionary, "The act of workmen in any trade or branch of industry when they leave their work with the object of compelling the master to concede certain demands made by them,—as an advance of wages, the withdrawal of a notice of reduction of wages, a shortening of the hours of work, the withdrawal of any obnoxious rule or regulation, or the like;" the Imperial Dictionary, "To quit work in order to compel an increase or prevent a reduction of wages;" the Century Dictionary, "To press a claim or demand by coercive or threatening action of some kind; in common usage, to quit work along with others, in order to compel an employer to accede to some demand, as for increase of pay, or to protest against something, as a reduction of wages; as to strike for higher pay, or shorter hours of work." Bouvier defines it: "A combined effort of workmen to obtain higher wages or other concessions from their employers by stopping work at a preconcerted time." The definition sanctioned by the court of appeals of New York in Railway Co. v. Bowns, 58 N. Y. 581, and embodied by Mr. Anderson in his Law Dictionary, is: "A combination among laborers, or those employed by others, to compel an increase of wages, change in the hours of labor, a change in the manner of conducting the business of the principal, or to enforce some particular policy in the character or the number of men employed, or the like." Mr. Black, in his Law Dictionary, defines it to be: "The act of a party of workmen employed by the same master, in stopping work all together at a preconcerted time, and refusing to continue, until higher wages or shorter time or some other concession is granted to them by the employer." Whichever definition may be preferred,—and possibly no one of them is precisely accurate,—there are running through all of them two controlling ideas: First, by compulsion to extort from the employer the concession demanded; second, a cessation of labor, but not the abandonment of employment. The stoppage of work is designed to be temporary, continuing only until the accomplishment of the design, and upon its accomplishment the resumption of employment. The cessation of labor is not a bona fide dissolution of contractual relations and an abandonment of the employment, but is designed as a means of coercion to accomplish the desired result. The cessation of labor is prearranged by the body of men through their organizations, and is to take effect simultaneously at a stated time, for the purpose of preventing the master from continuing his business, and to compel him to submit to the dictation of his servants. The definition of the term proffered to the court at the argument, recognized by the

labor organizations of the country, was this: "A strike is a concerted cessation of or refusal to work until or unless certain conditions which obtain or are incident to the terms of the employment are changed. The employé declines to longer work, knowing full well that the employer may immediately employ another to fill his place; also knowing that he may or may not be reemployed or returned to service. The employer has the option of acceding to the demand and returning the old employés to service, of employing new men, or of forcing conditions under which the old men are glad to return to service under the old conditions." This latter definition recognizes the idea of cessation of labor, but not an abandonment of employment. It suggests that the latter may result at the option of the master. It does not, in terms, declare a combination to extort, or to oppress, or to interfere in any way with the business of the employer, except as injury might result as an incident to the cessation of service. If the latter be the correct definition of a strike, society has been needlessly alarmed. I doubt if, in the light of the history of strikes, the child would be recognized by this baptismal name. One who has read the history of the strike at Homestead, with its cruel murders and barbarous torture; one who has read of the various strikes on railways, when cars were fired, rails torn up, engines demolished, and life destroyed; one who has read of the not infrequent summoning of the militia by the authorities of the state to put down riot and turbulence,—the universal concomitants of a strike,—would hardly yield assent to the definition suggested as even faintly conveying the true idea of a strike, as known of all men. The only force suggested is the force of inertia, the compulsion wrought by cessation from labor. Such a strike would be a harmless affair, and generally inoperative to effect the end designed. It could be availing only by the combination of the entire labor force of the country, in the nature of things impracticable. Unless, by other coercive measures, the employer is prevented from obtaining men in the place of those who should cease to work, a strike would be a mere weapon of straw. That is well understood by these organizations. While, according to the definition, the employé knows "full well that the master may immediately hire another to fill his place," he also knows full well that that must, at all odds, be prevented if the strike is to be made successful. Consequently the organizations provide, as confessed at the argument, for the expulsion and social ostracism of all members of the organizations who should not abandon work when the order to strike is given, or who should seek to fill the place of a striking member. Thus one of the most effective engines of compulsion is brought to bear upon unwilling members to effect the design of the combination. With respect to laborers not members and willing to work, other and not less effective means of intimidation must be and are employed in prevention of labor. The history of strikes declares that this intimidation has always taken the shape of threats and personal violence. Constructive violence has failed in large measure to pre-

vent the continuance of operation of business by the master. Naturally, therefore, we find resort to actual violence, the destruction of property, the disabling of railway trains, and the like.

Of the ideal strike, in the definition proposed at the argument, the only criticism to be indulged is that it is ideal, and never existed in fact. Undoubtedly, in the absence of restrictive contract, workmen have a right by concerted action to cease work to procure better terms of service, no compulsion being used except that incident to the cessation; subject, however, to the qualification, at least with respect to those employments that directly concern the public welfare, that reasonable notice of the quitting should be given. But such is not the strike of history. The definition suggested is misleading and pretentious. To my thinking, a much more exact definition of a strike is this: A combined effort among workmen to compel the master to the concession of a certain demand, by preventing the conduct of his business until compliance with the demand. The concerted cessation of work is but one of, and the least effective of, the means to the end; the intimidation of others from engaging in the service, the interference with, and the disabling and destruction of, property, and resort to actual force and violence, when requisite to the accomplishment of the end, being the other, and more effective, means employed. It is idle to talk of a peaceable strike. None such ever occurred. The suggestion is impeachment of intelligence. From first to last, from the earliest recorded strike to that in the state of West Virginia, which proceeded simultaneously with the argument of this motion, to that at Connellsville, Pa., occurring as I write, force and turbulence, violence and outrage, arson and murder, have been associated with the strike as its natural and inevitable concomitants. No strike can be effective without compulsion and force. That compulsion can come only through intimidation. A strike without violence would equal the representation of the tragedy of Hamlet with the part of Hamlet omitted. The moment that violence becomes an essential part of a scheme, or a necessary means of effecting the purpose of a combination, that moment the combination, otherwise lawful, becomes illegal. All combinations to interfere with perfect freedom in the proper management and control of one's lawful business, to dictate the terms upon which such business shall be conducted, by means of threats or by interference with property or traffic or with the lawful employment of others, are within the condemnation of the law. It has well been said that the wit of man could not devise a legal strike, because compulsion is the leading idea of it. A strike is essentially a conspiracy to extort by violence; the means employed to effect the end being not only the cessation of labor by the conspirators, but the necessary prevention of labor by those who are willing to assume their places, and, as a last resort, and in many instances an essential element of success, the disabling and destruction of the property of the master; and so, by intimidation and by the compulsion of force, to accomplish the end designed. I know of no peaceable strike. I think no strike was ever heard of that was or could be successful unaccompanied by intimidation and

violence. Counsel at the argument could recall but one which he was willing to indorse as peaceable. That was the strike upon the Lehigh Valley Railroad during the year 1893. The history of that occurrence does not carry out the declaration of counsel. There, as I understand, the running of trains was constantly interfered with, engines and cars disabled and wrecks caused by the violence of the strikers. The president of the company reported to his board of directors that the loss to freight and equipment by reason of the strike—which continued for less than three weeks—was $77,000, of which amount $46,000 was for damage done to locomotives alone. And that strike was not successful, the violence being insufficient. The history and legality of strikes has been well told by Mr. Justice Brewer, of the supreme court of the United States, in an admirable address before the New York Bar Association in January, 1893, in language that should be taken to heart by every one who has regard to the safety and peace of society, and the protection of our institutions.

"The common rule," says Mr. Justice Brewer, "as to strikes is this: Not merely do the employés quit the employment, and thus handicap the employer in the use of his property, and perhaps in the discharge of duties which he owes to the public, but they also forcibly prevent others from taking their places. It is useless to say that they only advise; no man is misled. When a thousand laborers gather around a railroad track, and say to those who seek employment that they had better not, and when that advice is supplemented every little while by a terrible assault on one who disregards it, every one knows that something more than advice is intended. It is coercion, force; it is the effort of the many, by the mere weight of numbers, to compel the one to do their bidding. · It is a proceeding outside of the law, in defiance of the law, and in spirit and effect an attempt to strip from one that has that which of right belongs to him,—the full and undisturbed use and enjoyment of his own. It is not to be wondered at that deeds of violence and cruelty attend such demonstrations as these; nor will it do to pretend that the wrongdoers are not the striking laborers, but lawless strangers who gather to look on. Were they strangers who made the history of the Homestead strike one of awful horror? Were they women from afar who so maltreated the surrendered guards, or were they the very ones who sought to compel the owners of the property to do their bidding? Even if it be true that at such places the lawless will gather, who is responsible for their gathering? Weihe, the head of a reputable labor organization, may open the door to lawlessness, but Beckman, the anarchist and assassin, will be the first to pass through; and thus it will be, always and everywhere. * * * This is the struggle of irresponsible persons and organizations to control labor. It is not in the interests of liberty; it is not in the interest of individual or personal rights. It is an attempt to give to the many a control over the few,—a step towards despotism. Let the movement succeed, let it once be known that the individual is not free to contract for his personal services, that labor is to be farmed out by organizations, as to-day by the Chinese companies, and the next step will be a direct effort on the part of the many to seize the property of the few."

No word of mine could give added strength to the thought suggested. The strike has become a serious evil, destructive to property, destructive to individual right, injurious to the conspirators themselves, and subversive of republican institutions. Certainly no court should give encouragement to any combination thus destructive of the very fabric of our government, tending to the disruption of society, and the obliteration of legal and natural rights.

Whatever other doctrine may be asserted by reckless agitators, it must ever remain the duty of the courts, in the protection of society, and in the execution of the laws of the land, to condemn, prevent, and punish all such unlawful conspiracies and combinations. Of this duty it was forcibly said by Judge Baker, of the district of Indiana, under like circumstances, in the Lake Erie & Western Cases, 61 Fed. 494:

"It may do for men that are reckless of the welfare of human society, who care nothing for its peace and good order, to imperil life, property, and liberty, and the perpetuity of our institutions by teaching such doctrines; but the judge who tolerates it ought to be stripped of his gown, and be driven from the sacred temple of justice."

The wrongs of labor are not to be righted by war upon society, by turbulence and disorder, by oppression and force. Such action alienates sympathy, and provokes resentment. In this land, only by peaceable means in the courts, and through the lawmaking power, can wrongs be redressed, and justice be established. Let combined labor deal with combined capital, but only in ways sanctioned by the law. When this lesson is learned, and becomes the rule of conduct, labor will acquire in a decade greater privileges and surer protection from wrong than could be extorted by a century of violence.

By the act of congress of July 2, 1890 (26 Stat. c. 647), every combination in restraint of trade or commerce among the several states is declared to be illegal. Under this act it was held by Judge Speer in Waterhouse v. Comer, 55 Fed. 149, that a strike, if it ever was effective, can be so no longer; and this view seems to have been held by Judge Billings in the case of U. S. v. Workingmen's Amalgamated Council, 54 Fed. 994. On the other hand, Judge Putman, in U. S. v. Patterson, 55 Fed. 605, is inclined to the view that the statute has no relation to labor organizations. I do not find it needful to enter into this field of discussion, or to express an opinion upon the subject, being content to rest my conclusion upon the grounds discussed.

One clause of the supplemental injunction has been characterized as wholly unwarranted. That clause is: "And from ordering, recommending, approving, or advising others to quit the service of the receivers of the Northern Pacific Railroad on January 1, 1894, or at any other time." In fairness, this clause must be read in the light of the statements of the petition. It was therein asserted to the court that the men would not strike unless ordered so to do by the executive heads of the national labor organizations, and that the men would obey such orders instead of following the direction of the court. The clause is specially directed to the chiefs of the several labor organizations. The use of the words, "order, recommend, approve, or advise," was to meet the various forms of expression under which by the constitution or by-laws of these organizations the command was cloaked,—as, for instance, in the one organization the chief head "advises" a strike, in another he "approves" a strike, in another he "recommends" the quitting of employment. Whatever terms may be employed, the effect is the

same. It is a command which may not be disregarded, under penalty of expulsion from the order and of social ostracism. This language was employed to fortify the restraints of the other portions of the writ, and to meet the various disguises under which the command is cloaked. It was so inserted out of abundant caution, that the meaning of the court might be clear, that there should be no unwarrantable interference with this property, no intimidation, no violence, no strike. It was perhaps unnecessary, being comprehended within the clause restraining the heads of these organizations from ordering, recommending, or advising a strike, or joinder in a strike. It is said, however, that the clause restrains an individual from friendly advice to the employés as a body or individually, as to their or his best interest in respect of remaining in the service of the receivers. Read in the light of the petitions upon which the injunction was founded, I do not think that such construction can be indulged by any fair and impartial mind. It might be used as a text for a declamatory address to excite the passions and prejudices of men, but could not, I think, be susceptible of such strained construction by a judicial mind. The language of a writ of injunction should, however, be clear and explicit, and, if possible, above criticism as to its meaning. Since, therefore, the language of this particular phrase may be misconceived, and the restraint intended is, in my judgment, comprehended within the other provisions of the writ, the motion in that respect will be granted, and the clause stricken from the writ.

In all other respects the motion will be denied.